UNITED STATES *v.* FORTY-EIGHT POUNDS OF RISING STAR TEA, ETC.

*District Court, N. D. California.* June 7, 1888.)

INDIANS—TRADING IN THE INDIAN COUNTRY—ABANDONED RESERVATION—KLA-MATH RESERVATION.

> By act Cong. April 8, 1864, the president was authorized to set apart not exceeding four tracts of land in California for Indian reservations, and in his discretion to include therein existing reservations. The lands in existing reservations not thus retained were to be sold as therein prescribed. Four reservations were accordingly set apart, among which the previously existing Klamath reservation was not included; but possession of the latter, which contained about 40 square miles, and on which were about 200 Indians, was retained by the United States, and some steps were taken towards its disposition. *Held,* that the Klamath reservation was not "Indian country" within the meaning of Rev. St. U. S. § 2133, prescribing the penalty for unlicensed trading in the Indian country.

At Law.

Seizure for violation of Rev. St. U. S. § 2133, providing that "any person other than an Indian who shall attempt to reside in the Indian country as a trader, or to introduce goods or to trade therein without such license, shall forfeit all merchandise offered for sale to the Indians or found in his possession, and shall moreover be liable to a penalty of five hundred dollars."

*J. E. McElrath* and *D. T. Sullivan,* for claimant.

*John T. Carey,* for the United States.

HOFFMAN, J. It is not denied that the claimant traded with the Indians residing on what has been known as the "Klamath River Reservation" in this state. The question to be considered is, is the land so known "Indian country" within the meaning of the section referred to. The Klamath Indian reservation was created by executive order, dated

November 16, 1855, pursuant to the act of March 3, 1855. It embraced a tract of land extending 20 miles up the river from its mouth, and one mile in width on each side of the river. It would seem from official reports that during the years following the establishment of the reservation some 2,500 Indians were collected upon it. In 1861 nearly all its arable lands, with the improvements thereon, were destroyed by floods, and the reservation was rendered almost worthless. In this condition of affairs the Indian agent, Mr. Hanson, strongly urged the selection of a new reservation to replace the destroyed Klamath reservation. This recommendation was adopted, but, it would seem, merely as a temporary refuge for the Klamath Indians; and on the 9th of April, 1862, the lands known as "Smith River Reserve," or such of them as had not already been purchased by Mr. Hanson from individuals, were, by order of the secretary of the interior, withdrawn from sale "for the present." The project of removing the Klamath Indians to a new reserve was carried out only in part. Between 400 and 500 of those Indians were actually removed. As they were self-supporting, subsisting almost entirely on fish, it was not deemed expedient to force their removal, or to restore the old reservation to the public domain. About three years after the floods, Superintendent Wiley reported that there were only 745 Indians at the Smith River agency. What became of those Indians, and of the large number said to have remained on the "destroyed" and worthless Klamath reservation, does not distinctly appear. The Smith River reserve was discontinued by act of congress of July, 1868; and the testimony in this case shows that the number of Indians on the old Klamath reservation is now only about 200. Their number is not constant, as many seek employment in the adjacent country. On the 8th April, 1864, an act of congress was passed "for the better organization of Indian affairs in California." By this act the two superintendencies theretofore existing were consolidated into one, and the president was authorized to set apart, at his discretion, not exceeding four tracts of land, within the limits of California, to be retained by the United States as Indian reservations. The president was further authorized in his discretion to include in such tracts any of the reservations theretofore set apart in the state, and to enlarge the same to such an extent as he might deem necessary to adapt them to their intended purpose. The lands of the existing reservations, not retained by the president, were, by the third section of the act, directed to be surveyed into parcels of suitable size, which were to be appraised at their cash value, and offered for sale at public outcry; but no lot was to be sold for less than its appraised value, nor for less than $1.25 per acre. The lands not so sold were thereafter to be held subject to sale at private entry, according to such regulations as the secretary of the interior might prescribe. It will be noted that by this act the lands of the old reservations not embraced within the new reservations to be set apart by the president are not restored to the public domain, nor subjected to the operations of the general land laws. They are to be surveyed "into lots or parcels of suitable size;" to be appraised and sold at auction to the highest bidder. The lots are to be of "suita-

ble," but indefinite, size. No right of pre-emption is to be acquired by settlement or occupation; and the lands not sold at auction are to be held subject to private entry, not under the general land laws, but according to such regulations as the secretary of the interior may prescribe. Under the provisions of this act four reservations were selected and set apart by the president: (1) The Tule River reservation, by executive order of October 3, 1873. Modified by executive order August 3, 1878. By this last order a part of the lands included in the order of October was restored to the public domain. (2) The Hoopa Valley reservation, by executive order of June 23, 1876. It appears to have been suggested; that the Klamath reservation should be included within or in some way attached to the Hoopa Valley reservation. But this suggestion does not seem to have been adopted. In the executive order the boundaries of the latter reservation are distinctly defined. They embrace an area of 89,572.43 acres; but do not include any portion of the abandoned Klamath River reservation. (3) Round Valley reservation, by executive orders of March 30, 1870; April 8, 1873; May 18, 1875; and July 26, 1876. (4) Reserves for Mission Indians, by executive orders of January 31, 1870; December 27, 1875; May 15, 1876; August 25, 1877; and various orders and modifications of orders unnecessary to enumerate.

Assuming that the various reserves known as "Mission Indian Reserves" were made under the provisions of the act of April 8, 1864, and constitute one reservation, it would seem that the authority conferred upon the president by that act has been exhausted. That authority was as we have seen, to set apart "not exceeding four tracts of land to be retained by the United States for the purposes of Indian reservations." It is evident that among these the former Klamath reservation, considered to be "nearly worthless," was not included. The lands of that reservation thus became subject to the provisions of the third section of the act relative to the disposition to be made of the "several Indian reservations in California which shall not be retained for the purposes of Indian reservations, under the provisions of the preceding section of this act." In the communication addressed to the district attorney by J. D. C. Atkins, commissioner of Indian affairs, he states that he does not find that any steps were ever taken to sell the Klamath reservation as an abandoned reservation, under the third section of the act of April 8, 1864, "nor has the general land-office ever been advised of the relinquishment of the same." But in the case of the appeal of John McCarthy from the decision of the general land-office suspending his pre-emption filing on a tract of land within the Klamath reservation, the secretary of the interior sustained the decision of the land-office, and states that the Klamath reservation has been regarded as an Indian reservation since the passage of the act of April 8, 1864, limiting the Indian reservations in California to four, and that various allotments within its limits have recently been made;" and he quotes his letter of March 26, 1883, to the commissioner of Indian affairs, in which he stated that "when the selections within said reservations were all made he would consider the question of restoring the remainder of the lands to the public domain." It is evident that

the secretary was dealing with the land as directed by the third section of the act of 1864, and that some steps had been taken to carry out the provisions of that section. That the lands continued to constitute a reservation in the sense that they were not open to entry under the general land laws was undoubtedly true But they constitute an abandoned reservation, to be disposed of as specifically provided for in section 3 of the act of 1864. Mr. Commissioner Atkins states, it will be noticed, that the general land-office has never been "advised of the relinquishment" of the reservation. This must be true. Nor has any executive order been made restoring the lands to the public domain. The Klamath River reservation not having been "retained for the purposes of Indian reservations," under the act of 1864, nor included within either of the four tracts of land set apart under its provisions, the third section took effect as a relinquishment of the lands "for the purposes of Indian reservations." But the United States still retained possession of the lands for the purpose of disposing of them as directed by that section. To have restored them to the public domain, and thus subjected them to the operation of the general land laws, or to have permitted the intrusion of settlers, pre-emptioners, or holders of Valentine scrip, would have made it impossible to carry into effect the provisions of section 3 in regard to their disposition.

Such being, in my judgment, the legal *status* of these lands, the question arises: Can a person who has traded with Indians on the Klamath river be prosecuted under the provisions of section 2133, which forbid the introduction of goods "into the Indian country," or trading with the Indians therein? The nature of the trade carried on by the claimant is not disputed. He has not resided on the reservation lands, and has made no settlement therein. At the proper season, he proceeds with his vessel to the river, and employs the Indians to fish for him, supplying them with seines and other appliances. He pays them "in trade," furnishing them with various articles composing the cargo of his vessel. They are set forth in the libel of information, several hundred in number, and their condemnation is prayed for. They consist in great part of articles suited to the wants of the Indians: tea, coffee, boots, shoes, overalls, hickory shirts, medical stores, etc. The very intelligent officer in charge of the Hoopa reservation, and who exercises some care and supervision over the Klamath Indians, stated to the court that he knew of no grounds of public policy or of consideration for the welfare of the Indians opposed to the traffic carried on by the claimant. The Indians are enabled to find employment, and receive in return for their labor supplies, the use of and taste for which must tend to promote their civilization, and their gradual renunciation of the habits and modes of living of savages. The offense of which the claimant is accused is thus purely technical; nor is the suppression of the traffic demanded by any consideration of policy, morals, or humanity. Whether he has committed any offense must therefore be determined on technical grounds. Assuming that trading with Indians on a reservation constitutes trading with Indians in an Indian country, my opinion is, that the Klamath lands are not such a res-

ervation as brings them within the meaning of the terms "Indian country." The lands are not reserved "for the purposes, of Indian reservations." The government retains possession of them for the purpose of selling them, as directed by law. If these lands do not constitute an Indian reservation, they are certainly not an "Indian country." They are held. by the United States for sale. And even if this were not the case, the residence of 200 Indians on a tract 40 square miles in area would not make the whole tract "Indian country" within the meaning and intention of the law. Libel of information is dismissed