[Civ. No. 29109. First Dist., Div. Four. Oct. 21, 1971.]

G. RAYMOND ARNETT, as Director, etc., Plaintiff and Respondent, v.
FIVE GILL NETS, Defendant;
RAYMOND MATTZ, Intervener and Appellant.

COUNSEL

George F. Duke, Richard B. Collins, Jr., Lee J. Sclar and William P. Lamb for Intervener and Appellant.

Evelle J. Younger, Attorney General, Roderick Walston and Charlton G. Holland, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**CHRISTIAN, J.**—Raymond Mattz appeals from a judgment ordering forfeiture under Fish and Game Code section 8630 of five nylon gill nets belonging to him. The nets had been seized by a state game warden at a point on the Smith River within one mile of its confluence with the Klamath River. The seizure occurred on land owned by a lumber company, less than 20 miles from the mouth of the Klamath.

Appellant intervened and resisted the petition for forfeiture, asserting

that he was an enrolled Indian fishing on Indian country and that the statutory prohibition against the use of gill nets was therefore inapplicable.

In 1953, Congress consented to the application of California criminal laws to Indians and "Indian country" (18 U.S.C. § 1162); but the enactment preserved Indian rights to fish or hunt "afforded under Federal treaty, agreement, or statute." Thus, appellant's position depends upon a showing (1) that the nets were found on "Indian country" within the meaning of the statute, and (2) that there was "a Federal treaty, agreement, or statute" establishing appellant's right to fish.

Fish and Game Code section 12300, enacted in response to the federal statute, provides that portions of the Fish and Game Code, including those sought to be applied here, do not apply to Indians whose names are inscribed on the tribal roll "while on the reservation of such tribe" in cases where the code would not previously have applied. (See *Elser* v. *Gill Net Number One* (1966) 246 Cal.App.2d 30, 36-37, [54 Cal.Rptr. 568].) Thus appellant's entitlement to protection under the California statute also depends on fact determinations: (1) whether appellant was "on the reservation," and (2) whether he was enrolled as a member of the tribe.

The trial court made a single dispositive determination that the land where the nets were seized was not Indian land within the meaning of either 18 United States Code section 1162 or Fish and Game Code section 12300. The only issue in the appeal is whether that determination was correct.

The following history of the land where the nets were seized is abstracted from *Elser* v. *Gill Net Number One, supra,* 246 Cal.App.2d 30, 33-34, and *Donnelly* v. *United States* (1912) 228 U.S. 243, 253-254 [57 L.Ed. 820, 824-825, 33 S.Ct. 449]. The disputed area is a strip running 20 miles upstream from the mouth of the Klamath River, and extending one mile on either side of the river. The area, inhabited by the Klamath Indians, was early designated the "Klamath River Reservation." The reservation was terminated in 1864 by an act of Congress which authorized the establishment of four reservations in California, and directed that land in the existing reservations not incorporated in the four designated reservations be sold. (13 Stat. 39.) Pursuant to the statute, the Hoopa Valley Reservation was created nearby. No part of the earlier Klamath River Reservation was incorporated in it; the former Klamath River Reservation was later adjudged to have been vacated. (*United States* v. *Forty-Eight Pounds of Rising Star Tea, etc.* (N.D.Cal. 1888) 35 F. 403, 406.)

Thereafter, in 1891, the Hoopa Valley Reservation was enlarged by executive order to include a strip of land one mile wide on each side of the river running from its former boundary to the mouth of the Klamath River.

This order was held to be effective. (*Donnelly* v. *United States, supra*, 228 U.S. 243, 258-259 [57 L.Ed. 820, 826-827].) Then, in 1892, pursuant to the 1887 General Allotment Act,[1] the strip which had previously been the old Klamath River Reservation was opened for public purchase. (27 Stat. 52.) This 1892 enactment is the basis of the conflict here. If it resulted in loss of reservation status of the old Klamath River Reservation area, the trial court was correct in finding that the nets were not seized on "Indian country." The appellate court in *Elser, supra*, 246 Cal.App.2d 30, 34, declared that the old Klamath River Reservation "for all practical purposes, almost immediately lost its identity as part of the Hoopa Valley Reservation." That statement, though persuasive, was dictum; it is therefore proper for us to reexamine the question.

Appellant claims that the land retained some characteristics of Indian interest, enough to justify its definition as "Indian country" under the statutes discussed above. Congress in 1949 defined "Indian country" for present purposes as including "all land within the limits of any Indian reservation under the jurisdiction of the United States Government, . . ." (18 U.S.C. § 1151.) This definition was applied in *Seymour* v. *Superintendent* (1962) 368 U.S. 351 [7 L.Ed.2d 346, 82 S.Ct. 424], where the United States Supreme Court was called upon to determine the status of another Indian reservation which had been opened to purchase by non-Indians. Although the reservation had been so opened, the court found evidence that Congress had continued to recognize the existence of the reservation; therefore it was held that the state criminal laws did not apply. (368 U.S. at pp. 356-357 [7 L.Ed.2d at pp. 349-350].) The question is whether the former Klamath River Reservation should be covered by the holding of *Seymour*.

In *Seymour*, the court dealt with the Colville Reservation in the State of Washington. In 1892, the Colville Reservation had been divided and the northern one-half "vacated and restored to the public domain" (27 Stat. 62-64). The southern half remained as a reservation. Then, in 1906, Congress authorized the Secretary of the Interior "to sell or dispose of unalloted lands in the diminished Colville Indian Reservation" (34 Stat. 80-82). The act provided for allotments to Indians on the reservation, and provided that proceeds from the sales were to be used for the benefit of the Colville and related Indians (34 Stat. 80-82, § 6). That act was implemented by a proclamation by President Wilson in 1916 (39 Stat. 1778-1779). The Washington Supreme Court held that the reservation status of the southern one-half of the old Colville Reservation had been extinguished. (*State* ex rel. *Best* v.

---

[1] 24 Stat. 388.

*Superior Court* (1919) 107 Wash. 238, 241 [181 P. 688, 689].) The United States Supreme Court in *Seymour* held to the contrary, pointing to several indications of congressional intent: (1) the 1906 act, unlike the 1892 act which had expressly vacated the northern half of the reservation, contained no language erasing the reservation; indeed, the 1906 statute referred to the continuing existence of the Colville Reservation; (2) the 1892 act provided that proceeds from the sale of the lands could be appropriated for general public use, while the 1906 act reserved the proceeds of sales thereunder for the use of the Colville and related Indians; (3) Congress had repeatedly since 1906 referred to the continuing existence of the diminished Colville Reservation (see 368 U.S. at p. 356, fn. 12 and 13 [7 L.Ed.2d at p. 350]), most recently in a 1956 act—restoring the unsold lands to tribal ownership—which referred specifically to "the existing reservation" (70 Stat. 626-627).

The Klamath River Reservation was opened for public purchase in 1892, in a statute enacted a few days before that which vacated the northern half of the Colville Reservation. (27 Stat. 52.) The Klamath statute provided "That all of the lands embraced in what was Klamath River Reservation . . . are hereby declared to be subject to settlement, entry, and purchase under the laws of the United States granting homestead rights and authorizing the sale of mineral, stone, and timber lands: . . ." The act provided for Indians then located on the land to apply for allotments within one year and directed that the proceeds of sale were to be used for the Indians then residing on the land. The provision for disposition of proceeds was amended in 1917 so that the funds might be used for improvements to Indian allotments and for construction of roads, trails, etc. (39 Stat. 969, 976.)

The Klamath River Reservation history bears some resemblance to the Colville history reviewed in *Seymour*. Like the act opening the southern half of the Colville Reservation, 27 Stat. 52 does not specifically vacate the Klamath River Reservation. Also like the 1906 act, 27 Stat. 52 provides for allocation of proceeds to the Indians of the area rather than to the general revenues of the United States.

However, there are important differences between the Colville history and the Klamath River history. Unlike the 1906 act, which specifically referred to the continuing existence of the Colville Reservation, 27 Stat. 52 does not refer to the Klamath River Reservation as continuing in existence; indeed, it mentions "the lands embraced in what *was* [the] Klamath River Reservation." (Italics added.) The statute opening the Klamath River Reservation was enacted approximately two weeks before the statute vacating the north half of the Colville Reservation, and both acts were implementa-

tions of the General Allotment Act, 24 Stat. 388. From the differences in language a difference in intent may reasonably be inferred.

Like the subsequent history of the Colville Reservation, which contains several congressional references to its continuing existence, there are two references to the Klamath River Reservation in statutes enacted after the 1892 act. In 25 United States Code section 348a (enacted in 1942 by 56 Stat. 1081) the "period of trust on lands allotted to Indians of the Klamath River Reservation, California . . . ." was extended. Appellant contends that the reference to the "Klamath River Reservation" implies a congressional assumption that the reservation still existed. The context does not support this interpretation; the reference to the reservation seems to have had no greater purpose than to identify the allotments to which the trust extension was to apply. The second congressional reference to the Klamath River Reservation is more significant. In 72 Stat. 121 (Public Law 85-420) it was enacted (in 1958) as follows: "[A]ll lands now or hereafter classified as vacant and undisposed-of ceded lands (including townsite lots) on the following named Indian reservations are hereby restored to tribal ownership, subject to valid existing rights:

| "Reservation and State | Approximate Acreage |
|---|---|
| Klamath River, California | 159.57 |
| Coeur d'Alene, Idaho | 12,877.65 |
| Crow, Montana | 10,260.95 |
| Fort Peck, Montana | 41,450.13 |
| Spokane, Washington | 5,451.00 |

"*Provided,* That such restoration shall not apply to any lands while they are within reclamation projects heretofore authorized.

"SEC 2. Title to the lands restored to tribal ownership by this Act shall be held by the United States in trust for the respective tribe or tribes, and such lands are hereby added to and made a part of the existing reservations for such tribe or tribes.

"SEC. 3. The lands restored to tribal ownership by this Act may be sold or exchanged by the tribe, with the approval of the Secretary of the Interior."

Use of the expression "on the following named Indian reservations" does indeed suggest that the draftsman of the 1958 statute may have regarded the Klamath reservation as having continued existence. But this apparent understanding of Congress cannot reasonably be construed as an *enactment* reviving the entire old Klamath reservation which, as we have seen, had been spoken of as defunct in the 1892 statute. Arguably the 1958 statute reestablished as "Indian country" the 159.57 acres which it "restored to

tribal ownership." But that area, of course, does not include the privately owned land where the nets were seized.

In summary, the opening of the old Klamath reservation to unrestricted homestead entry in 1892 is strongly inconsistent with the continued existence of the reservation; an Indian reservation is by definition an area reserved from homestead entry or other allotment to individual ownership for the purpose of allowing tribal life and land use to continue. The history reviewed above does not show, as did the Colville history, that Congress intended to preserve the old Klamath reservation in existence while opening the land to private entry.

The judgment is affirmed.

Devine, P. J., and Rattigan, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied December 16, 1971. Peters, J., was of the opinion that the petition should be granted.