# MATTZ *v.* ARNETT, DIRECTOR, DEPARTMENT OF FISH AND GAME

No. 71–1182.  Argued March 27–28, 1973—Decided June 11, 1973

BLACKMUN, J., delivered the opinion for a unanimous Court.

*Lee J. Sclar* argued the cause and filed briefs for petitioner.

*Roderick Walston,* Deputy Attorney General of California, argued the cause for respondent. With him on the briefs were *Evelle J. Younger,* Attorney General, and *Carl Boronkay,* Assistant Attorney General.

*Harry R. Sachse* argued the cause for the United States as *amicus curiae* urging reversal. With him on the brief

were *Solicitor General Griswold, Assistant Attorney General Frizzell, Carl Strass,* and *Glen R. Goodsell.*

MR. JUSTICE BLACKMUN delivered the opinion of the Court.

Our decision in this case turns on the resolution of the narrow question whether the Klamath River Indian Reservation in northern California was terminated by Act of Congress or whether it remains "Indian country," within the meaning of 18 U. S. C. § 1151.[1] When established, the reservation was described as "a strip of territory commencing at the Pacific Ocean and extending 1 mile in width on each side of the Klamath River"

---

[1] Title 18 U. S. C. § 1151 defines the term "Indian country" to include, *inter alia,* "all lands within the limits of any Indian reservation under the jurisdiction of the United States Government, notwithstanding the issuance of any patent . . . ."

Title 18 U. S. C. § 1162 (a) provides that, with respect to Indian country within California, that State "shall have jurisdiction over offenses committed by or against Indians in the areas of Indian country . . . to the same extent that such State . . . has jurisdiction over offenses committed elsewhere within the State . . . , and the criminal laws of such State . . . shall have the same force and effect within such Indian country as they have elsewhere within the State . . . ." Section 1162 (b) provides, however, "Nothing in this section . . . shall deprive any Indian or any Indian tribe, band, or community of any right, privilege, or immunity afforded under Federal treaty, agreement, or statute with respect to hunting, trapping, or fishing or the control, licensing, or regulation thereof."

Finally, the California Fish & Game Code § 12300 (Supp. 1973), reads:

"Irrespective of any other provision of law, the provisions of this code are not applicable to California Indians whose names are inscribed upon the tribal rolls, while on the reservation of such tribe and under those circumstances in this State where the code was not applicable to them immediately prior to the effective date of Public Law 280, Chapter 505, First Session, 1953, 83d Congress of the United States [18 U. S. C. § 1162]."

for a distance of approximately 20 miles, encompassing an area not exceeding 25,000 acres. This description is taken from President Franklin Pierce's Executive Order issued November 16, 1855, pursuant to the authority granted by the Act of March 3, 1853, 10 Stat. 226, 238, and the Act of March 3, 1855, 10 Stat. 686, 699.[2]

Petitioner Raymond Mattz is a Yurok, or Klamath River, Indian who, since the age of nine, regularly fished, as his grandfather did before him, with dip, gill, and trigger nets, at a location called Brooks Riffle on the Klamath River. On September 24, 1969, a California game warden confiscated five gill nets owned by Mattz. The nets were stored near Brooks Riffle, approximately 200 feet from the river, and within 20 miles of the river's mouth.

The respondent Director of the Department of Fish and Game instituted a forfeiture proceeding in state court. Mattz intervened and asked for the return of his nets. He alleged, among other things, that he was an enrolled member of the Yurok Tribe, that the nets were seized within Indian country, and that the state statutes prohibiting the use of gill nets, Cal. Fish & Game Code §§ 8664, 8686, and 8630, therefore were inapplicable to him. The state trial court, relying on *Elser* v. *Gill Net Number One,* 246 Cal. App. 2d 30, 54 Cal. Rptr. 568 (1966), found that the Klamath River Reservation in 1892 "for all practical purposes almost immediately lost its identity," [3] and concluded that the area where the

---

[2] The Executive Order is reproduced in 1 C. Kappler, Indian Affairs—Laws and Treaties 817 (1904) (hereinafter Kappler).

At the end of this opinion, as the Appendix, is a map of the Klamath River Reservation. The area described in the text is indicated as the "Old Klamath River Reservation."

[3] See Pet. for Cert., App. B 4-5.

nets were seized was not Indian country. The court thereby disposed of petitioner's primary defense to the forfeiture. It did not reach other issues bearing upon the application of the California statutes to Indian country and the existence of Indian fishing rights there.

On appeal, the State Court of Appeal affirmed, holding that, inasmuch as the area in question had been opened for unrestricted homestead entry in 1892, the earlier reservation status of the land had terminated. 20 Cal. App. 3d 729, 97 Cal. Rptr. 894 (1971). The Supreme Court of California, one judge dissenting, denied a petition for hearing. See 20 Cal. App. 3d, at 735, 97 Cal. Rptr., at 898. We granted certiorari, 409 U. S. 1124 (1973), because the judgments of the state courts appeared to be in conflict with applicable decisions of this Court.

We now reverse. The reversal, of course, does not dispose of the underlying forfeiture issue. On remand, the questions relating to the existence of Mattz' fishing rights and to the applicability of California law notwithstanding reservation status will be addressed. We intimate no opinion on those issues.

## I

While the current reservation status of the Klamath River Reservation turns primarily upon the effect of an 1892 Act of Congress which opened the reservation land for settlement, the meaning and effect of that Act cannot be determined without some reference to the Yurok Tribe and the history of the reservation between 1855 and 1892.

The Yurok Indians apparently resided in the area of the lower Klamath River for a substantial period before 1855 when the Klamath River Reservation was established. Little is known of their prior history. There are sources, however, that provide us with relatively

detailed information about the tribe, its culture, living conditions, and customs for the period following 1855.[4] That the tribe had inhabited the lower Klamath River well before 1855 is suggested by the name. Yurok means "down the river." The names of the neighboring tribes, the Karok and the Modok, mean, respectively, "up the river" and "head of the river," and these appellations, as would be expected, coincide with the respective homelands. Powers 19; Kroeber 15.[5]

---

[4] A. Kroeber, Handbook of the Indians of California, cc. 1–4, published as Bulletin 78, Bureau of American Ethnology 1–97 (1925) (hereinafter Kroeber); S. Powers, Tribes of California, cc. 4 and 5, published as 3 Contributions to North American Ethnology 44–64 (1877) (hereinafter Powers). Various Annual Reports of the Commissioner of Indian Affairs provide further information; see, for example, the 1856 Report of the Commissioner of Indian Affairs 249–250 (hereinafter Report).

[5] Kroeber, in the preface to his work, suggests that the factual material contained in Powers' manuscript is subject to some criticism. Kroeber's reference to Powers deserves reproduction in full here:

"I should not close without expressing my sincere appreciation of my one predecessor in this field, the late Stephen Powers, well known for his classic 'Tribes of California,' one of the most remarkable reports ever printed by any government. Powers was a journalist by profession and it is true that his ethnology is often of the crudest. Probably the majority of his statements are inaccurate, many are misleading, and a very fair proportion are without any foundation or positively erroneous. He possessed, however, an astoundingly quick and vivid sympathy, a power of observation as keen as it was untrained, and an invariably spirited gift of portrayal that rises at times into the realm of the sheerly fascinating. Anthropologically his great service lies in the fact that with all the looseness of his data and method he was able to a greater degree than anyone before or after him to seize and fix the salient qualities of the mentality of the people he described. The ethnologist may therefore by turns writhe and smile as he fingers Powers's pages, but for the broad outlines of the culture of the California Indian, for its values with all their high lights and shadows, he can still do no better than consult the book. With

By the Act of March 3, 1853, 10 Stat. 238, the President was "authorized to make five military reservations from the public domain in the State of California or the Territories of Utah and New Mexico bordering on said State, for Indian purposes." The Act of March 3, 1855, 10 Stat. 699, appropriated funds for "collecting, removing, and subsisting the Indians of California . . . on two additional military reservations, to be selected as heretofore . . . *Provided,* That the President may enlarge the quantity of reservations heretofore selected, equal to those hereby provided for." President Pierce then issued his order of November 16, 1855, specifying the Klamath River Reservation and stating, "Let the reservation be made, as proposed." Kappler 817.

The site was ideally selected for the Yuroks. They had lived in the area; the arable land, although limited, was "peculiarly adapted to the growth of vegetables," 1856 Report 238; and the river, which ran through a canyon its entire length, abounded in salmon and other fish. *Ibid.;* 1858 Report 286.[6]

In 1861 nearly all the arable lands on the Klamath River Reservation were destroyed by a freshet, and, upon recommendation of the local Indian agent, some of the Indians were removed to the Smith River Reservation, established for that purpose in 1862. Only a small number of Yuroks moved to the new reservation, however, and nearly all those who did move returned within a few

all its flimsy texture and slovenly edges, it will always remain the best introduction to the subject." Kroeber ix.

[6] Of this area one agent stated, "No place can be found so well adapted to these Indians, and to which they themselves are so well adapted, as this very spot. No possessions of the Government can be better spared to them. No territory offers more to these Indians and very little territory offers less to the white man. The issue of their removal seems to disappear." 1885 Report 266.

years to the Klamath River. *Crichton* v. *Shelton,* 33 I. D. 205, 208 (1904); Kappler 830; 1864 Report 122. The Smith River Reservation was then discontinued. Act of July 27, 1868, 15 Stat. 198, 221.

The total Yurok population on the Klamath River Reservation in the 1860's cannot be stated with precision. In 1852, based in part on a rough census made by a trader, it was estimated at 2,500. Kroeber 16–17.[7]

---

[7] It is interesting to note that Powers believed the Yurok population at one time far exceeded 2,500 and perhaps numbered over 5,000. This was, as Powers stated, "before the whites had come among them, bringing their corruptions and their maladies . . . ." Powers 59. The renowned Major John Wesley Powell, who was then in charge of the United States Geographical and Geological Survey of the Rocky Mountain Region, Department of the Interior, placed little faith in Powers' figures and requested that he modify his estimates. Powers expressed his displeasure at this in a letter to Major Powell stating, in characteristic fashion,

"I have the greatest respect for your views and beliefs, and, with your rich fund of personal experience and observation; if you desire to cut out the paragraph and insert one under your own signature, in brackets, or something of that kind, I will submit without a murmur, if you will add this remark, as quoted from myself, to wit: 'I desire simply to ask the reader to remember that Major Powell has been accustomed to the vast sterile wastes of the interior of the continent, and has not visited the rich forests and teeming rivers of California.' But I should greatly prefer that you would simply disavow the estimates, and throw the whole responsibility upon me.

"This permission I give you; but I have waded too many rivers and climbed too many mountains to abate one jot of my opinions or beliefs for any carpet-knight who yields a compiling-pen in the office of the —— or ——. If any critic, sitting in his comfortable parlor in New York, and reading about the sparse aboriginal populations of the cold forests of the Atlantic States, can overthrow any of my conclusions with a dash of his pen, what is the use of the book at all? As Luther said, at the Diet of Worms, 'Here I stand; I cannot do otherwise.'

"I beg you, my dear major, not to consider anything above

The effect of the 1861 flood cannot be firmly established; but it is clear that the tribe remained on the Klamath thereafter.[8] For later years, Kroeber estimated that the population in 1895 was 900, and, in 1910, 668. Kroeber 19. From this it would appear that the flood at least did not cause a dissolution of the tribe; on the contrary, the Yuroks continued to reside in the area through the turn of the century and beyond.

The Act of April 8, 1864, 13 Stat. 39, designated California as one Indian superintendency. It also recited that "there shall be set apart by the President, and at his discretion, not exceeding four tracts of land, within the limits of said state, to be retained by the United States for the purposes of Indian reservations." It further provided that "the several Indian reservations in California which shall not be retained . . . under . . . this act, shall . . . be surveyed into lots or parcels . . . and . . . be offered for sale at public outcry, and thence afterward shall be held subject to sale at private entry." *Id.*, at 40.

At the time of the passage of the 1864 Act there were, apparently, three reservations in California: the Klamath River, the Mendocino, and the Smith River. It appears, also, that the President did not take immediate

---

written as in the slightest degree disrespectful to yourself; such is the farthest remove from my thoughts." Powers 2–3.

Powers' estimates were not altered, and the above-quoted letter was placed sympathetically by Major Powell in the introductory section of Powers' published study.

[8] 1864 Report 122; Opinion dated Jan. 20, 1891, of the Assistant Attorney General for the Department of the Interior, quoted in *Crichton v. Shelton*, 33 I. D. 205, 210 (1904); Kroeber 19. Another source estimates that in 1871 the Indian population along the Klamath was 2,500. Report of D. H. Lowry, Indian Agent, Sept. 1, 1871, noted in *Short v. United States*, No. 102–63, p. 35 (Report of Commissioner, Court of Claims, 1972).

action, upon the passage of the Act, to recognize reservations in California. It was not until 1868 that any formal recognition occurred, and then it was the Congress, rather than the President, that acted. In that year Congress discontinued the Smith River Reservation, 15 Stat. 221, and restored the Mendocino to the public lands. *Id.*, at 223. No similar action was taken with respect to the Klamath River Reservation. *Crichton* v. *Shelton*, 33 I. D., at 209. Congress made appropriations for the Round Valley Reservation, 15 Stat. 221, and for it and the Hoopa Valley Reservation in 1869, 16 Stat. 37, although neither of these, apparently, had been established theretofore by formal Executive Order.[9]

The Klamath River Reservation, although not reestablished by Executive Order or specific congressional action, continued, certainly, in *de facto* existence. Yuroks remained on reservation land, and the Department of Indian Affairs regarded the Klamath River Reservation as "in a state of reservation" throughout the period from 1864 to 1891.[10] No steps were taken to sell the reservation, or parts thereof, under the 1864 Act. Indeed, in 1879, all trespassers there were removed by the military. In 1883 the Secretary of the Interior directed that allotments of land be made to the Indians on the reservation.[11] In February 1889, the Senate, by

---

[9] The Hoopa Valley Reservation was located August 21, 1864, but formally set apart for Indian purposes, as authorized by the 1864 Act, by President Grant only by Executive Order dated June 23, 1876. Kappler 815. See Appendix map. The area is that described as the "Original Hoopa Valley Reservation."

[10] Letter dated Apr. 4, 1888, from the Commissioner of Indian Affairs to the Secretary of the Interior, quoted in *Crichton* v. *Shelton*, 33 I. D., at 211.

[11] The allotments, however, were postponed "on account of the discovery of gross errors in the public surveys." *Ibid.*; 1885 Report XLVIII.

resolution, directed the Secretary of the Interior "to inform the Senate what proceedings, if any, have been had in his Department relative to the survey and sale of the Klamath Indian reservation . . . in pursuance of the provisions of the act approved April 8, 1864." 20 Cong. Rec. 1818. In response, the Commissioner of Indian Affairs, by letter dated February 18, 1889, to the Secretary disclosed that no proceedings to this effect had been undertaken.[12] An Assistant Attorney General for the Department of the Interior expressed a similar view in an opinion dated January 20, 1891.[13]

---

[12] "In response to said resolution, I have to state that I am unable to discover from the records or correspondence of this office that any proceedings were ever had or contemplated by this Department for the survey and sale of said reservation under the provisions of the act aforesaid; on the contrary, it appears to have been the declared purpose and intention of the superintendent of Indian affairs for California, who was charged with the selection of the four reservations to be retained under said act, either to extend the Hoopa Valley Reservation (one of the reservations selected under the act), so as to include the Klamath River Reservation, or else keep it as a separate independent reservation, with a station or subagency there, to be under control of the agent at the Hoopa Valley Reservation, and the lands have been held in a state of reservation from that day to this (Ex. Doc. 140, pp. 1, 2)." Quoted in *Crichton* v. *Shelton,* 33 I. D., at 212.

[13] "Pushing aside all technicalities of construction, can any one doubt that for all practical purposes the tract in question constitutes an Indian reservation? Surely, it has all the essential characteristics of such a reservation; was regularly established by the proper authority; has been for years and is so occupied by Indians now, and is regarded and treated as such reservation by the executive branch of the government, to which has been committed the management of Indian affairs and the administration of the public land system . . . . It is said, however, that the Klamath River reservation was abolished by section three of the act of 1864. Is this so?

.        .        .        .        .

"In the present instance, the Indians have lived upon the described tract and made it their home from time immemorial; and

In 1888, in a forfeiture suit, the United States District Court for the Northern District of California concluded that the area within the Klamath River Reservation was not Indian country, within the meaning of Rev. Stat. § 2133, prescribing the penalty for unlicensed trading in Indian country. The court concluded that the land composing the reservation was not retained or recognized as reservation land pursuant to the 1864 Act and that, therefore, it no longer constituted an Indian reservation. *United States* v. *Forty-eight Pounds of Rising Star Tea,* 35 F. 403 (ND Cal. 1888). This holding was expressly affirmed on appeal to a circuit judge. 38 F. 400 (CCND Cal. 1889). The Assistant Attorney General, in the opinion referred to above, conceded the probable correctness of the judgment but was not convinced that his own views were erroneous, and he could not assent to the reasoning of the court. He felt that the court's comments as to the abandoned status of the reservation "were *dicta* and not essential to the decision of the case before the court." *Crichton* v. *Shelton,* 33 I. D., at 215.

Thus, as of 1891, it may be fair to say that the exact legal status of the Klamath River Reservation was obscure and uncertain. The petitioner in his brief here,

---

it was regularly set apart as such by the constituted authorities, and dedicated to that purpose with all the solemnities known to the law, thus adding official sanction to a right of occupation already in existence. It seems to me something more than a mere implication, arising from a rigid and technical construction of an act of Congress, is required to show that it was the intention of that body to deprive these Indians of their right of occupancy of said lands, without consultation with them or their assent. And an implication to that effect is all, I think that can be made out of that portion of the third section of the act of 1864 which is supposed to be applicable." Quoted in *Crichton* v. *Shelton,* 33 I. D., at 212–213.

p. 14, states that the reservation "ceased to exist in 1876, at the latest."

Any question concerning the reservation's continuing legal existence, however, appears to have been effectively laid to rest by an Executive Order dated October 16, 1891, issued by President Benjamin Harrison.[14]  By the specific terms of that order, the Hoopa Valley Reservation, which, as we already have noted, was located in 1864 and formally set apart in 1876, and which was situated about 50 miles upstream from the Klamath River's mouth, was extended so as to include all land, one mile in width on each side of the river, from "the present limits" of the Hoopa Valley Reservation to the Pacific Ocean.  The Klamath River Reservation, or what had been the reservation, thus was made part of the Hoopa Valley Reservation, as extended.

The reason for incorporating the Klamath River Reservation in the Hoopa Valley Reservation is apparent. The 1864 Act had authorized the President to "set apart" no more than four tracts for Indian reservations in California.  By 1876, and certainly by 1891, four reservations already had been so set apart.  These were the Round Valley, referred to above, the Mission,[15] the Hoopa

---

[14] "It is hereby ordered that the limits of the Hoopa Valley Reservation in the state of California, a reservation duly set apart for Indian purposes, as one of the Indian reservations authorized to be set apart, in said State, by Act of Congress approved April [8], 1864, (13 Stats., 39), be and the same are hereby extended so as to include a tract of country one mile in width on each side of the Klamath River, and extending from the present limits of the said Hoopa Valley reservation to the Pacific Ocean; *Provided, however,* That any tract or tracts included within the above described boundaries to which valid rights have attached under the laws of the United States are hereby excluded from the reservation as hereby extended." Kappler 815.

[15] Kappler 819–824. It is noteworthy that the boundaries of the Mission Reservation were altered repeatedly between 1870 and 1875,

Valley, and the Tule River. Kappler 830–831. Thus, recognition of a fifth reservation along the Klamath River was not permissible under the 1864 Act. Accordingly, the President turned to his authority under the Act to expand an existing, recognized reservation. He enlarged the Hoopa Valley Reservation to include what had been the Klamath River Reservation as well as an intervening riparian strip connecting the two tracts.[16] The President's continuing authority so to enlarge reservations and, specifically, the legality of the 1891 Executive Order, was affirmed by this Court in *Donnelly* v. *United States*, 228 U. S. 243, 255–259 (1913), reh. denied, 228 U. S. 708, and is not challenged here.

## II

This general background as to the origin and development of the Klamath River Reservation is not contested by either party. The reservation's existence, pursuant to the Executive Order of 1891, is conceded. The present controversy relates to its termination subsequent to 1891, and turns primarily upon the effect of the Act of June 17, 1892, 27 Stat. 52, entitled "An act to provide for the

---

and even thereafter. These actions were taken under the President's continuing authority to set apart and add to or diminish the four reservations authorized under the 1864 Act. *Donnelly* v. *United States*, 228 U. S. 243 and 708 (1913). In its final form, the Mission Reservation consisted of no less than 19 different and noncontiguous tracts. Kappler 819–824; *Crichton* v. *Shelton*, 33 I. D., at 209–210.

[16] See Appendix map. The strip of land between the Hoopa Valley Reservation and the Klamath River Reservation is referred to there as the "Connecting Strip." Under the 1891 Executive Order the Hoopa Valley Reservation was extended to encompass all three areas indicated on the map. The connecting strip and the old Klamath River Reservation frequently are referred to as the Hoopa Valley Extension.

disposition and sale of lands known as the Klamath River Indian Reservation." This Act provided:

> "That all of the lands embraced in what was Klamath River Reservation in the State of California, as set apart and reserved under authority of law by an Executive order dated November sixteenth, eighteen hundred and fifty-five, are hereby declared to be subject to settlement, entry, and purchase under the laws of the United States granting homestead rights and authorizing the sale of mineral, stone, and timber lands: *Provided,* That any Indian now located upon said reservation may, at any time within one year from the passage of this act, apply to the Secretary of the Interior for an allotment . . . . And the Secretary of the Interior may reserve from settlement, entry, or purchase any tract or tracts of land upon which any village or settlement of Indians is now located, and may set apart the same for the permanent use and occupation of said village or settlement of Indians. . . . *Provided further,* That the proceeds arising from the sale of said lands shall constitute a fund to be used under the direction of the Secretary of the Interior for the maintenance and education of the Indians now residing on said lands and their children."

The respondent Director argues that this statute effected the termination of the Klamath River Reservation. The petitioner urges the contrary. It is our task, in light of the language and purpose of the Act, as well as of the historical background, outlined above, to determine the proper meaning of the Act and, consequently, the current status of the reservation.

The respondent relies upon what he feels is significant language in the Act and upon references in the legislative history. He contends, "The fact that the lands were to be opened up for settlement and sale by homesteaders strongly militates against a continuation of such reservation status." Brief for Respondent 3.

We conclude, however, that this is a misreading of the effect of the allotment provisions in the 1892 Act. The meaning of those terms is to be ascertained from the overview of the earlier General Allotment Act of 1887, 24 Stat. 388. That Act permitted the President to make allotments of reservation lands to resident Indians and, with tribal consent, to sell surplus lands. Its policy was to continue the reservation system and the trust status of Indian lands, but to allot tracts to individual Indians for agriculture and grazing. When all the lands had been allotted and the trust expired, the reservation could be abolished.[17] Unallotted lands were made available to non-Indians with the purpose, in part, of promoting interaction between the races and of encouraging Indians to adopt white ways. See § 6 of the General Allotment Act, 24 Stat. 390; United States Department of the Interior, Federal Indian Law 115–117, 127–129, 776–777 (1958).[18]

---

[17] The trust period on allotments to Indians on the Klamath River Reservation expired in 1919, but was later extended by Congress by the Act of Dec. 24, 1942, 56 Stat. 1081, 25 U. S. C. § 348a. See S. Rep. No. 1714, 77th Cong., 2d Sess. (1942). And in 1958 Congress restored to tribal ownership vacant and undisposed-of ceded lands on various reservations, including 159.57 acres on the Klamath River Reservation. Pub. L. 85–420, 72 Stat. 121.

[18] For an extended treatment of allotment policy, see D. Otis, History of the Allotment Policy, in Readjustment of Indian Affairs, Hearings on H. R. 7902 Before the House Committee on Indian Affairs, 73d Cong., 2d Sess., 428–440 (1934). The policy of allotment and sale of surplus reservation land was repudiated in 1934 by the Indian Reorganization Act, 48 Stat. 984, now amended and codified as 25 U. S. C. § 461 et seq.

Under the 1887 Act, however, the President was not required to open reservation land for allotment; he merely had the discretion to do so.

In view of the discretionary nature of this presidential power, Congress occasionally enacted special legislation in order to assure that a particular reservation was in fact opened to allotment.[19] The 1892 Act was but one example of this. Its allotment provisions, which do not differ materially from those of the General Allotment Act of 1887, and which in fact refer to the earlier Act, do not, alone, recite or even suggest that Congress intended thereby to terminate the Klamath River Reservation. See *Seymour* v. *Superintendent,* 368 U. S. 351, 357–358 (1962). Rather, allotment under the 1892 Act is completely consistent with continued reservation status. This Court unanimously observed, in an analogous setting in *Seymour, id.,* at 356, "The Act did no more [in this respect] than open the way for non-Indian settlers to own land on the reservation in a manner which the Federal Government, acting as guardian and trustee for the Indians, regarded as beneficial to the development of its wards." See *United States* v. *Celestine,* 215 U. S. 278 (1909); *United States* v. *Nice,* 241 U. S. 591 (1916). See also *Wilbur* v. *United States,* 281 U. S. 206 (1930); *Donnelly* v. *United States,* 228 U. S. 243 (1913).

### III

The respondent further urges, however, that his view of the effect of the 1892 Act is supported by the Act's ref-

---

[19] See, for example, the Act of Mar. 2, 1889, 25 Stat. 888 (Sioux Reservations), and *United States* v. *Nice,* 241 U. S. 591 (1916); the Act of Mar. 22, 1906, 34 Stat. 80 (Colville Reservation), and *Seymour* v. *Superintendent,* 368 U. S. 351 (1962); the Act of May 29, 1908, 35 Stat. 460 (Cheyenne River and Standing Rock Reservations), and *United States ex rel. Condon* v. *Erickson,* 478 F. 2d 684 (CA8 1973), aff'g 344 F. Supp. 777 (SD 1972).

erence to "what was [the] Klamath River Reservation." According to the respondent, this reference, and other references in the legislative history, compel the conclusion that Congress intended to terminate the reservation in 1892.

The 1892 Act, to be sure, does refer to the Klamath River Reservation in the past tense. But this is not to be read as a clear indication of congressional purpose to terminate. Just a few weeks before the bill (H. R. 38, 52d Cong., 1st Sess.), which eventually became the Act, was reported out of committee on February 5, 1892, H. R. Rep. No. 161, 52d Cong., 1st Sess., the President had formally extended the Hoopa Valley Reservation to include the Klamath River Reservation. And only that portion of the extension which had been the Klamath River Reservation was the subject of the 1892 Act. The reference to the Klamath River Reservation in the past tense seems, then, merely to have been a natural, convenient, and shorthand way of identifying the land subject to allotment under the 1892 Act.[20] We do not believe

---

[20] The respondent argues, however, that Congress, perhaps unacquainted with the Executive Order of October 1891, intended this language to convey the view expressed in the House Report, H. R. Rep. No. 161, supra, 23 Cong. Rec. 1598–1599 (1892), that the Klamath River Reservation had long been abandoned and, in fact and in law, had already been terminated.

It is clear from the text, infra, that there were efforts in certain quarters of the House to terminate the reservation and open it for white settlement. See Short v. United States, supra, n. 8, at 34–52. While the respondent's interpretation of the phrase is plausible, it is no less plausible to conclude, in light of the repeated and unsuccessful efforts by the House to terminate the reservation, that the Senate proponents of the legislation were not inclined to make their cause (of requiring allotments) less attractive to the House by amending the bill to refer to the "former Klamath River Reservation, now part of the Hoopa Valley Reservation" rather than "what was [the] Klamath River Reservation."

the reference can be read as indicating any clear purpose to terminate the reservation directly or by innuendo.

The respondent also points to numerous statements in the legislative history that, in his view, indicate that the reservation was to be terminated. We need not refer in detail to the cited passages in H. R. Rep. No. 161, *supra,* or to the debates on the bill, 23 Cong. Rec. 1598–1599, 3918–3919 (1892), for there is no challenge here to the view that the House was generally hostile to continued reservation status of the land in question. In our estimation, however, this very fact, in proper perspective, supports the petitioner and undermines the respondent's position.

As early as 1879, there were efforts in Congress to abolish the Klamath River Reservation. From that date to 1892 strong sentiment existed to this effect. But it does not appear that termination ever commanded majority support. The advocates of termination argued that the reservation, as of 1879, long had been abandoned; that the land was useless as a reservation; and that many white settlers had moved on to the land and their property should be protected. See H. R. Rep. No. 1354, 46th Cong., 2d Sess., 5 (1880). That whites had settled there is clear, but the view that no Indians remained after the flood of 1861 appears to have been a gross misconception on the part of those who sought termination.[21]

---

[21] The Department of the Interior took issue with the Committee's population estimates. H. R. Rep. No. 1148, 47th Cong., 1st Sess., 1–3 (1882). In a letter transmitted to the Committee on Indian Affairs in 1881, an infantry lieutenant, acting as Indian Agent, suggested that the Committee's population estimates were "gleaned principally from civilians, who are, I believe, somewhat inclined to lessen the number, thinking doubtlessly that the smaller the number the greater the likelihood of its being thrown open to settlers." *Id.,* at 2.

The first bill providing for public entry and sale of the Klamath River Reservation was introduced in the Senate on May 28, 1879. S. Res. 34, 46th Cong., 1st Sess.; 9 Cong. Rec. 1651. The resolution referred to the reservation's having been "abandoned" in 1855 " and the tribe removed to another reservation established for its use." No action was taken on the bill, and another, of the same purport, was introduced on January 12, 1880, in the House. H. R. 3454, 46th Cong., 2d Sess.; 10 Cong. Rec. 286. This bill provided that the reservation "be, and the same is hereby, abolished," and authorized and directed the Secretary of the Interior to survey the lands and have them made subject to homestead and preemption entry and sale "the same as other public lands." It is clear from the report on this second bill, H. R. Rep. No. 1354, *supra*, at 1–5, that the establishment of the reservation in 1855 was viewed as a mistake and an injustice. According to the Report, the reservation had been abandoned after the 1861 freshet, and the Indians had moved to the Smith River and, later, the Hoopa Valley Reservations. White settlers had moved in and wished to exploit the lumber and soil of the area which, some said, "has no equal in California as a fruit and wine growing country." *Id.*, at 5. Inasmuch as the reservation blocked access to the river, the resources of the area could not be developed. Although unmentioned in that Report, the Office of Indian Affairs opposed the bill. See H. R. Rep. No. 1148, 47th Cong., 1st Sess., 1 (1882). The bill as reported was recommitted and no further action was taken. 10 Cong. Rec. 3126 (1880).

An identical bill was introduced in the following Congress. H. R. 60, 47th Cong., 1st Sess.; 13 Cong. Rec. 90 (1881). The Commissioner of Indian Affairs opposed the bill as introduced, but stated that he would not oppose it if provision for prior allotments to the Indians was made. H. R. Rep. No. 1148, *supra*, at 2. The

Commissioner's proposed amendment was approved by the Committee, 13 Cong. Rec. 3414 (1882), but no action on the bill was taken by the full House.

In 1883 and 1884 three more bills were introduced. It is of interest to note that each acceded to the request of the Commissioner that provision be made for prior allotments to resident Indians. H. R. 112, 48th Cong., 1st Sess.; 15 Cong. Rec. 62 (1883); S. 813, 48th Cong., 1st Sess.; 15 Cong. Rec. 166 (1883); H. R. 7505, 48th Cong., 1st Sess.; 15 Cong. Rec. 5923 (1884). Each bill would have "abolished" the reservation and would have made the land subject to homestead and pre-emption entry. None of the bills was enacted, although passage must have been generally regarded as likely, for the Indian Bureau in 1883 began the work of allotment and survey, perhaps in anticipation of passage.

In 1885 two bills were introduced in the House. Each was substantially identical to those introduced in 1883 and 1884. H. R. 158 and H. R. 165, 49th Cong., 1st Sess.; 17 Cong. Rec. 370 (1885). No action was taken on either bill.

No further bills, apparently, were introduced until 1889. During the intervening period, however, the General Allotment Act of 1887, 24 Stat. 388, was passed and thereafter amended, 26 Stat. 794. The *Rising Star Tea* case, 35 F. 403, was also decided.

In 1889 a bill providing for the allotment of the Klamath River Reservation was introduced. The allotments, however, were to be made in a manner inconsistent with the General Allotment Act. H. R. 12104, 50th Cong., 2d Sess.; 20 Cong. Rec. 756 (1889). And after affirmance of the *Rising Star Tea* case by the circuit court, 38 F. 400 (1889), identical bills were introduced in the House and the Senate providing, without mention of allotment, that "all of the lands embraced in what was Klamath River Reservation . . . are hereby de-

clared to be subject to settlement, entry, and purchase" under the land laws. H. R. 113, 51st Cong., 1st Sess.; 21 Cong. Rec. 229 (1889); S. 2297, 51st Cong., 1st Sess.; 21 Cong. Rec. 855 (1890). The Indian Office opposed the bills, recommending that they be amended to provide for allotments to the Indians under the General Allotment Act, that surplus lands be restored to the public domain, and that the proceeds be held in trust for the Klamath River Indians. See *Short* v. *United States*, No. 102-63, pp. 44-45 (Report of Commissioner, Court of Claims, 1972). H. R. 113 was reported out of committee with certain amendments, including one to the effect that proceeds arising from the sale of lands were to be used for the "removal, maintenance, and education" of the resident Indians, the Hoopa Valley Reservation being considered the place of removal. Allotments to the Indians on the Klamath Reservation, however, were emphatically rejected. H. R. Rep. No. 1176, 51st Cong., 1st Sess., 2 (1890). The bill was so amended and passed the House. 21 Cong. Rec. 10701-10702 (1890). It died in the Senate.

In light of the passage of this last bill in the House and the presence of the *Rising Star Tea* opinions, the Indian Department moved to have the Klamath River Reservation land protected for the Indians residing there. The details of this effort, including the opinion of the Assistant Attorney General, referred to above, are outlined in the Commissioner's report in *Short* v. *United States, supra,* at 45-50. These efforts culminated in President Harrison's Executive Order of October 1891 expanding the Hoopa Valley Reservation to include the Klamath River Reservation.

It is against this background of repeated legislative efforts to terminate the reservation, and to avoid allotting reservation lands to the Indians, that the 1892 Act was introduced. H. R. 38, 52d Cong., 1st Sess.; 23 Cong.

Rec. 125 (1892). The bill provided for the settlement, entry, and purchase of the reservation land and specified that the proceeds should be used for the "removal, maintenance, and education" of the resident Indians. No allotments were provided for, as the Indians were "semicivilized, disinclined to labor, and have no conception of land values or desire to cultivate the soil." H. R. Rep. No. 161, 52d Cong., 1st Sess., 1 (1892). The House Committee on Indian Affairs amended the bill by changing the word "and" to "or" in the proviso relating to the use of proceeds. *Id.,* at 2.

The bill passed the House without change. 23 Cong. Rec. 1598–1599 (1892). It was struck out in the Senate, however, and another version was substituted deleting reference to the removal of the Indians and providing that before public sale the land should be allotted to the Indians under the General Allotment Act of 1887, as amended. *Id.,* at 3918–3919. This substitute measure had the support of the Interior Department. *Id.,* at 3918. The Senate called for a conference with the House, *id.,* at 3919, and the conference adopted the Senate version with amendments. Sen. Misc. Doc. No. 153, 52d Cong., 1st Sess. (1892). The bill was then passed and became the 1892 Act.

## IV

Several conclusions may be drawn from this account. First, the respondent's reliance on the House Report and on comments made on the floor of the House is not well placed. Although the primary impetus for termination of the Klamath River Reservation had been with the House since 1871, this effort consistently had failed to accomplish the very objectives the respondent now seeks to achieve. Likewise, the House in 1892 failed to accomplish these objectives, for the Senate version, supported by the Interior Department, was substituted for that of

504

the House. The Senate version, ultimately enacted, provided for allotments to the Indians and for the proceeds of sales to be held in trust for the "maintenance and education," not the removal, of the Indians. The legislative history relied upon by the respondent does not support the view that the reservation was terminated; rather, by contrast with the bill as finally enacted, it compels the conclusion that efforts to terminate the reservation by denying allotments to the Indians failed completely.

A second conclusion is also inescapable. The presence of allotment provisions in the 1892 Act cannot be interpreted to mean that the reservation was to be terminated. This is apparent from the very language of 18 U. S. C. § 1151, defining Indian country "notwithstanding the issuance of any patent" therein. More significantly, throughout the period from 1871–1892 numerous bills were introduced which *expressly* provided for the termination of the reservation and did so in unequivocal terms. Congress was fully aware of the means by which termination could be effected. But clear termination language was not employed in the 1892 Act. This being so, we are not inclined to infer an intent to terminate the reservation.[22] The Court stated in *United States* v. *Celestine,* 215 U. S., at 285, that "when Congress has

---

[22] Congress has used clear language of express termination when that result is desired. See, for example, 15 Stat. 221 (1868) ("the Smith River reservation is hereby discontinued"); 27 Stat. 63 (1892) (adopted just two weeks after the 1892 Act with which this case is concerned, providing that the North Half of the Colville Indian Reservation, "the same being a portion of the Colville Indian Reservation . . . be, and is hereby, vacated and restored to the public domain"), and *Seymour* v. *Superintendent,* 368 U. S., at 354; 33 Stat. 218 (1904) ("the reservation lines of the said Ponca and Otoe and Missouria Indian reservations be, and the same are hereby, abolished").

once established a reservation all tracts included within it remain a part of the reservation until separated therefrom by Congress." A congressional determination to terminate must be expressed on the face of the Act or be clear from the surrounding circumstances and legislative history. See *Seymour* v. *Superintendent*, 368 U. S. 351 (1962); *United States* v. *Nice*, 241 U. S. 591 (1916).[23]

Finally, our conclusion that the 1892 Act did not terminate the Klamath River Reservation is reinforced by repeated recognition of the reservation status of the land after 1892 by the Department of the Interior and by Congress. In 1904 the Department, in *Crichton* v. *Shelton*, 33 I. D. 205, ruled that the 1892 Act reconfirmed the continued existence of the reservation. In 1932 the Department continued to recognize the Klamath River Reservation, albeit as part of the Hoopa Valley Reservation,[24] and it continues to do so today. And Congress has recognized the reservation's continued existence by extending the period of trust allotments for this very reservation by the 1942 Act, described above, 25 U. S. C. § 348a, and by restoring to tribal ownership certain vacant and undisposed-of ceded lands in the reservation by the 1958 Act, *supra*.[25]

---

[23] In *United States ex rel. Condon* v. *Erickson*, 478 F. 2d 684 (1973), the United States Court of Appeals for the Eighth Circuit reached a similar conclusion in a case presenting issues not unlike those before us. The court concluded, *id.*, at 689, that "a holding favoring federal jurisdiction is required unless Congress has *expressly or by clear implication* diminished the boundaries of the reservation opened to settlement" (emphasis in original).

[24] Hearings before a Subcommittee of the Senate Committee on Indian Affairs, Survey of Conditions of the Indians in the United States, pt. 29, California, 72d Cong., 1st Sess., 15532 (1934).

[25] Although subsequent legislation usually is not entitled to much weight in construing earlier statutes, *United States* v. *Southwestern Cable Co.*, 392 U. S. 157, 170 (1968), it is not always without significance. See *Seymour* v. *Superintendent*, 368 U. S., at 356–357.

We conclude that the Klamath River Reservation was not terminated by the Act of June 17, 1892, and that the land within the boundaries of the reservation is still Indian country, within the meaning of 18 U. S. C. § 1151.

The judgment of the Court of Appeal is reversed, and the case is remanded for further proceedings.

*It is so ordered.*

# APPENDIX TO OPINION OF THE COURT

### Map of Hoopa Valley Indian Reservation, California*

Scale: 1 inch = 12 miles

LEGEND:

| | |
|---|---|
| ▨▨▨▨▨ | Old Klamath River Reservation. |
| ▦▦▦▦▦ | Connecting Strip. |
| ▨▨▨▨▨ | Original Hoopa Valley Reservation. |

*United States Department of Interior, General Land Office 1944.