## In re "The State House Construction Loan."

The constitution of the State, article IV., section 13, provides as follows:—
"Sec. 13.   The General Assembly shall have no power hereafter, without the express consent of the people, to incur State debts to an amount exceeding fifty thousand dollars, except in time of war, or in case of insurrection or invasion."

The following proposition was submitted to the people in November, 1892, and approved by the necessary vote:—"Shall the General Assembly be authorized and directed to provide for the issue of State bonds in an amount not to exceed $1,500,000, so much of said sum as may be necessary to be applied to the purchase of a site for, and the erection and completion of, a new State House?"

Pub. Laws, cap. 1201, passed May 24, 1893, provided a Board of State House Commissioners with authority on behalf of the State to acquire a site for a new State House, to erect thereon a new State House substantially in accordance with a specified plan, to make all necessary contracts for constructing and furnishing the same and the grading of the grounds; and to employ competent architects, a superintendent, secretary, and other assistants, and fix their compensation.   Provision for the expenses to be incurred was made by authorizing the issue of "*The State House Construction Loan*" to the amount of $1,500,000, the proceeds of which, or so much thereof as might be necessary, being appropriated to pay the bills audited by said board, or its committee thereof duly authorized, the appropriation not to expire with the fiscal year but to continue during the existence of the board:—

*Held*, that the General Assembly is competent, through a commission, to build a State House at such cost as it sees fit, provided it does not thereby incur a State debt exceeding $50,000 without the consent of the people; and it may be years about it, as might be convenient to raise the money and make successive appropriations.

The language of the above vote of the people authorizing a State loan does not limit the amount that may be expended for acquiring a site and building a State House thereon, but merely indicates the purposes for which said loan was authorized.   It so far limits the use of the fund itself as to prevent it from being appropriated to any other purpose until the State House shall have been completed.

If the State House fund prove insufficient to finish the new State House, the General Assembly can apply to this use such other sums as are legally available for the purpose.

If the people had intended to impose upon the use of this fund the condition that the new State House should be completed therewith, it is to be presumed that they would have employed more definite terms to express that intent than their vote contains.

The State House Commissioners are not trustees in the legal sense of the word, although they must act strictly within their authority.

The reference to sums of money in the vote and legislation above recited do not operate as a limitation upon the cost of the State House and its site.

If the State House Commissioners make contracts for more than $1,500,000 their action would be void in so far as it involved a violation of the constitutional restriction in regard to incurring debt. But they can legally contract for a State House which, together with the site, will cost a sum as much greater than said State House fund as is necessary to enable them to erect a State House substantially in accordance with the plan referred to in said chapter 1201, provided, however, that all contracts in excess of said State House fund shall stipulate that no money shall be required to be paid thereon whenever and so long as there shall be no unexpended appropriation applicable to the payment of bills audited by said commission.

April 8, 1897.

*To His Excellency Charles Warren Lippitt, Governor of the State of Rhode Island and Providence Plantations.*

We have received from Your Excellency a communication requesting our opinion upon the following questions :

"I. Can said State House fund legally be utilized to acquire a site for a State House and to erect thereon a portion as one-half or three-fourths, of a State House ?

II. Are the commissioners created by Chapter 1201 of the Public Laws of Rhode Island trustees of said State House fund ?

III. If said commissioners are trustees of said State House fund, can they legally contract for a State House on a site, which together with said State House will cost a sum much greater than said trust fund ?

IV. If said commissioners are not trustees of said fund can they legally contract as specified in question III ? "

By the term "State House fund," we understand is meant the sum authorized to be raised by loan by a vote of the people adopting the proposition for the issue of State bonds, and which proposition, contained in Pub. Laws R. I., cap. 1093, passed May 19, 1892, reads as follows :—

"Shall the General Assembly be authorized and directed to provide for the issue of State bonds in an amount not to exceed the sum of $1,500,000, so much of said sum as may

be necessary to be applied to the purchase of a site for, and the erection and completion of, a new State House?"

The first question calls for a construction of the language used in said proposition only, and for a definition of the limitations and conditions applicable to the use of said State House fund by the General Assembly, or by any officers or agents acting under its authority, be they called State House Commissioners or otherwise howsoever.

The last three questions apply solely to the State House Commissioners; and their scope, briefly stated, we apprehend to be as follows: Can the State House Commissioners under their present authority legally contract for the erection of a State House which, when completed, together with the site, will have cost more than $1,500,000?

The first question is much broader than the other questions, inasmuch as it applies both to the General Assembly—the creator, so to speak—and to the State House Commissioners— its creatures.

The State House Commissioners can only exercise the authority given them by the General Assembly which appointed them, and the General Assembly can only confer such authority as it is constitutionally authorized to confer. The General Assembly is constitutionally competent, through the agency of a commission by it appointed, to build a State House at such a cost as it sees fit, provided it does not thereby assume to incur a State debt, without the express consent of the people, to an amount exceeding $50,000. It could, therefore, build a State House out of the funds of the State raised by taxation, or however otherwise legally derived; but it could not for that purpose constitutionally incur a State debt to an amount exceeding $50,000 without the express consent of the people (R. I. Con. Art. IV, § 13); and it could be years about it, just as it might be convenient to raise the money and make successive appropriations.

The General Assembly has seen fit, in building a State House, to resort—in part at least—to a State loan authorized by the express consent of the people; and the amount of the

loan so authorized, the object to which the proceeds thereof are to be applied, and such other conditions, if any, imposed upon the authority to borrow on the State's credit, are contained in the proposition hereinbefore referred to and set forth.

We have already said, in reply to a former inquiry whether this fund could legally and properly be used to pay the general expenses of the State for a period, at the termination of which it would be replaced, that it was "analogous to a trust fund, and cannot be legally applied to any other purpose than that for which it was created, except by the consent of the people, by whom it was created." *In re the State House Fund*, 19 R. I. (RR.) 216, 219.

What, then, is the meaning of the words, as used in said proposition, "so much of said sum as may be necessary to be applied to the purchase of a site for, and the erection and completion of, a new State House?" In our opinion they have not such a definite and precise meaning as to operate as words of limitation upon the amount to be expended by the General Assembly upon the purchase of a site and the erection thereon of a State House, but are merely indicative of the purpose for which said loan was authorized, and serve as a limitation only upon the use of the fund itself; that is to say, no part of said State House fund shall be used for any other purpose than for the purchase of a site and the erection thereon of a new State House, until, at least, said State House shall have been completed. If said State House fund is not sufficient to finish the new State House, then the General Assembly can apply towards its erection such other sums as are legally available for such purpose, derived either through taxation, other authorized loans, or otherwise, howsoever, as it may see fit. If the people had intended to impose as a condition upon the use of the proceeds of the State bonds by the General Assembly, its officers or agents, that no portion thereof should be applied towards the erection of a State House, unless said $1,500,000 would suffice to entirely finish and complete the same, it is only reasonable to presume they would have used more definite, precise, and unambiguous

terms than those employed, to express an intent so easy to be expressed in apt and meet phraseology.

Our answer to the first question, therefore, is that, in our opinion, said State House fund can legally be utilized in acquiring a site and erecting thereon such portion of a new State House as the same may be sufficient to pay for, whether it be one-half, or three-fourths, or any other proportion.

The question whether the State House Commissioners are "trustees," in the legal sense of the word must be answered in the negative.

They are entrusted with the disposition of a fund which is devoted by law to certain purposes which we have said is "analogous" to a trust fund; but so are other officials who could not be called trustees. The governor, for instance, has at his disposal a certain fund which he may expend in his discretion for the apprehension of criminals. This does not make him a trustee and subject his administration of the fund to the supervision of a court of equity.

In the case of a real trust, if the trustee is guilty of misconduct he may be summoned to account, at suit of the beneficiary, and he may be removed and a successor may be appointed, or the court may direct him how to administer the fund or assume the disposition of it through a receiver or a master in chancery. These commissioners are officials of the State, agents of the General Assembly, and accountable to the legislature for their official acts. If public office is a public trust it is so in a moral sense, not in legal intendment

As the third question submitted to us is predicated upon an affirmative answer to the second, no further consideration of it is called for.

We now come to the last question. The authority of the State House Commissioners, so far as erecting a State House is concerned, is defined in Pub. Laws R. I. cap. 1201, of May 24, 1893, which provides, *inter alia*, that certain persons, naming them, shall constitute a Board of State House Commissioners who shall perform the duties specified in said chapter; shall hold office for a sufficient time to accomplish the purposes of said act, and serve without compensation;

shall at once proceed to select and acquire a site for a new State House in the name of the State of Rhode Island; and shall, in the exact language of section 2 of said act, "erect thereon a new State House substantially in accordance with the plan accompanying the report of the State House Commission made to the General Assembly at its January session, 1892, and recommended by said commission." Section 3 is as follows: "Said board is hereby authorized to make, on behalf of the State, all contracts for the construction of said State House and furnishing thereof, and for the grading and putting into suitable condition the grounds surrounding the same, provided that all portions of said work exceeding in cost the sum of five hundred dollars shall be done by contract, and that proposals for all work or material exceeding one thousand dollars in value shall be advertised for." Said chapter 1201 also authorized and directed said board to employ a competent architect or architects, and authorized it, if it deemed it advisable, to employ a superintendent, a secretary, and other assistants, and to fix the compensation of all persons so employed ; also to hire offices necessary for the proper carrying on of its labors. To meet the expenses incurred under said act registered bonds to an amount not exceeding $1,500,000, to be designated "The State House Construction Loan," were authorized to be issued from time to time, at such times and in such installments as the said board shall determine, to the highest bidder, but at not less than the par value thereof; and the amount received from the sale of said bonds less any premium received over the par value, or so much thereof as might be necessary, was thereby, in the exact language of the act contained in section 9, "appropriated for the payment of bills audited by said board, or by a committee thereof duly constituted for that purpose." The State House Commissioners were likewise required to submit a report annually to the General Assembly as to the progress of the work, and what contracts had been entered into by them since the last preceding report.

The State House Commissioners must act strictly within their authority. If they were authorized to erect a building,

the cost of which together with the site was not to exceed
$1,500,000, then their power was limited to the expenditure
of the restricted sum ; *Turney* v. *Town of Bridgeport*, 55
Conn. 412 ; and they must keep within their authority in all
other respects. *Boston Electric Co.* v. *City of Cambridge*,
163 Mass. 64, 68, and cases cited. In brief, they were author-
ized, first, to select and acquire a site in the name of the
State of Rhode Island. It will be noted that no limitation
was put upon the location, nor the size of the site, nor the
price to be paid. Nothing is said in Chap. 1201 whether it
was to be merely large enough to accommodate the building,
as is practically the case in Massachusetts, or whether it was
to be a park, as in the case of Connecticut and some other
States ; nor whether it was to be located in the city of Provi-
dence, the city of Newport, or elsewhere within the State.
The site having been acquired, they were authorized, sec-
ondly, to quote the words of the act, " to erect thereon a new
State House substantially in accordance with the plan accom-
panying the report of the State House Commission made to
the General Assembly at its January session, 1892, and recom-
mended by said commission." It will be observed that the
State House Commission last above referred to is not the
present board of State House Commissioners appointed in
cap. 1201, though a large majority of the present board
were members of the former commission. The duty of the
present board, then, was to erect a State House substantially
in accordance with said plan ; but the report accompanying
the plan nowhere fixed a limit of cost of the building,
although one of the conditions prescribed for competing
architects, contained in said report, stated that the designs
submitted should be of a fire-proof building, and one that
could be completed at a cost not exceeding $1,000,000, on a
good average foundation ; and three bids by one contractor
for erecting a State House according to the plan recom-
mended by the commission and referred to in cap. 1201
were given, varying in amount, the highest from the lowest,
nearly $200,000, according to the material used, and two of

said bids exceeded $1,000,000, one by $83,000, and the other by $175,000.

The sum *appropriated* under said cap. 1201 for the payment of bills audited by said board amounted to $1,500,000.

In our opinion said references to sums of money do not operate as a limitation upon the cost of the building and its site, for we think the amounts named by the former commission, in its report, were but expressions of opinion (*Shea v. Inhabitants of Milford*, 145 Mass. 528, 529, 531), and the General Assembly apparently so regarded them, as in Chap. 1201 it appropriated a much larger sum than either of the bids given in said report, although, of course, the cost of a site was problematical, as was also the cost of furnishing the State House after it was constructed, and of grading and putting the State House grounds into suitable condition as provided for in Sec. 3.   If a limit to an exact sum was intended, it was a simple matter for the legislature to have added to the description of, or reference to, the building to be constructed, the words, *not exceeding in cost the sum of $1,500,000*, or any other figure it saw fit, or to have used other apt words to express its intention.   Limitations upon the cost of public buildings were not unknown in this State, as the original act for building the Providence County Court House provided for a commission, in the language of the act, "for the purpose of building a court house on said lot at a cost not exceeding $150,000;" and by later legislation in regard to the same subject the court house commissioners were, to quote again, "empowered to build a new court house upon the lot in said act designated, substantially according to the plans submitted to the General Assembly; and said commissioners are hereby empowered to advertise for proposals, and to make contracts for the construction of said new court house, and to superintend the same until completed: provided, however, that said commissioners shall not make contracts for the expenditure of a greater sum than $200,000, without further authority from the General Assembly."   Though the court house commissioners were authorized to contract to the amount of $200,000, yet but $100,000 was then appropriated

for carrying out the purpose of their employment, other appropriations being made later; the total of the appropriations finally authorized and made being $225,000, the cost of the completed structure being slightly less than said last mentioned sum.    R. I. Acts & Res. Jan. 1875, 169, 312; Jan. Ses. 1876, 236; Jan. Ses. 1877, 212.    The only limitation as to cost, placed upon the present State House Commissioners, is that the building shall be substantially in accordance with the plan hereinbefore referred to; and that is far from definite.    It is evident that very broad authority was given, but that was the concern of the General Assembly, as it could constitutionally confer such authority as it saw fit, provided it did not assume to incur a State debt of more than $50,000 without the express consent of the people.

In *Shea* v. *Inhabitants of Milford, supra,* where a contractor sued the town for work done and material furnished in erecting the Memorial Hall, in Milford, the defence being that the committee entrusted with doing the work had exceeded its authority, Mr. Justice Wm. Allen, in delivering the opinion of the Supreme Court of Massachusetts, used this language: "It is further argued that the committee could not make any contract which involved an expenditure in excess of the whole amount appropriated by the town, $22,000. The vote does not expressly prohibit the committee from incurring liabilities beyond the amount of the appropriation, and we do not think that such prohibition can be implied. While it was probably intended to make an appropriation large enough to cover the contract price and such 'extra work' as would be likely to be required, there seems to be no prohibition against contracting for 'extra work' beyond the amount of the appropriation, if circumstances should justify and require it."

Should the State House Commissioners make contracts for more than $1,500,000 their action would be void in so far as it involved a violation of the constitutional restriction in regard to incurring debt; and then, too, there is an evident purpose manifested in section 9 of cap. 1201 that whatever the cost of the State House and site may be, the State shall

only be compelled to pay as fast as the General Assembly shall see fit to provide funds and appropriate the money.

In reply to the last question, we are of the opinion that the State House Commissioners can legally contract for a State House which, together with the site, will cost a sum as much greater than said State House fund as is necessary to enable them to erect a State House substantially in accordance with the plan referred to in said section 2 of cap. 1201, *provided*, however, that all contracts made by them in excess of said State House fund shall stipulate that no money shall be required to be paid thereon whenever and so long as there shall be no unexpended appropriation applicable to the payment of bills audited by said Board of State House Commissioners.

Owing to the absence of Mr. Chief Justice Matteson from the State, we have been unable to confer with him.

> JOHN H. STINESS,
> PARDON E. TILLINGHAST,
> GEORGE A. WILBUR,
> HORATIO ROGERS,
> WILLIAM W. DOUGLAS.