316 A.2d 334.

NARRAGANSETT RACING ASSOCIATION, INC. *vs.*
JOHN H. NORBERG, *Tax Administrator.*

MARCH 14, 1974.

PRESENT: Paolino, Joslin, Kelleher and Doris, JJ.

KELLEHER, J. We have issued a writ of certiorari pursuant to the provisions of the Administrative Procedures Act, G. L. 1956 (1969 Reenactment) §42-35-16. The petitioner is the Tax Administrator of the State of Rhode Island. He seeks a review of a Superior Court order reversing his determination that the respondent herein is delinquent in the amount of certain taxes in the state. The respondent operates a horse racetrack which is head-

quartered in Pawtucket. Hereinafter, we shall refer to the petitioner as the "Administrator" and the respondent as "Narragansett."

Prior to 1971, the state imposed an eight and one-half per cent tax on the total money wagered at a pari-mutuel track. (Section 41-4-3.) Such taxes are due and payable at the close of each day's racing. (Section 41-4-8.) At its January 1971 session the General Assembly amended §41-4-3 by enacting P. L. 1971, ch. 222 so that the pari-mutuel tax rate was increased from eight and one-half per cent to nine per cent. The amendment further provided that, in the event of a conflict in racing dates assigned to Rhode Island tracks with those of a track operating in New England, the tax rate would be reduced to eight and one-half per cent. The controversy before us presents a pure question of law involving the language used by the Legislature in addressing itself to the problem posed by two New England racetracks operating at the same time. The pertinent provisions of ch. 222 read thus:

> "However, each licensee conducting thoroughbred racing during such periods when thoroughbred race tracks in other New England states are conducting thoroughbred racing at the same time as those in this state shall, under the pari-mutuel system, pay to the state, and there is hereby imposed:
>
> (a) a tax at the rate of eight and one-half (8½%) of the total money wagered on such events * * *."

The record certified to us discloses that Narragansett Park's 1971 fall meeting began on September 4 and ended on December 18. During this time the horses were racing at Rockingham racetrack in New Hampshire and at Suffolk Downs in Massachusetts. Racing at Rockingham ended in mid-October. Suffolk then opened and continued its operation almost until mid-December. However, neither

out-of-state track operated on Tuesdays,[1] and this fact caused a conflict between Narragansett and the Administrator. Narragansett paid an eight and one-half per cent tax on money wagered on Tuesdays' races. The Administrator ruled that because on Tuesdays the only thoroughbred horses racing in New England were racing at Narragansett Park, there was no conflict on those days and the nine per cent rate was to be imposed on Tuesdays' betting.

The language in the 1971 amendment which precipitated this proceeding are the phrases "during such periods," and "at the same time." In justifying the nine per cent tax rate, the Administrator relies on the principle that a tax exemption is to be strictly construed and he then defines the word "periods" as used in the 1971 enactment to mean the aggregate of days during the 1971 fall meeting when Rockingham and Suffolk Downs were open for business. Under the Administrator's view, each day of conflict constitutes a period. Consequently, there would be five conflicting periods a week, i.e., Monday, Wednesday, Thursday, Friday, and Saturday. While we give the Administrator an "A" for his zeal in seeking to enrich the state's coffers, we cannot concur in his view of ch. 222.

While we have some doubt that a one-half per cent reduction of the pari-mutuel tax could be properly classified as an exemption,[2] we will not employ a rule calling for a strict construction to nullify the obvious intent of the General Assembly. *Palmer* v. *Couper*, 109 R. I. 241, 283 A.2d 672 (1971). The paramount task in construing a statute is to ascertain the intent behind its enactment

---

[1] Rockingham closed Tuesdays because it took advantage of legislation permitting horse racing on Sundays.

[2] An exemption has been defined as a release from the burden of enforced contributions to expenses and maintenance of government or an immunity from the general tax. *Kroger Co.* v. *Schneider,* 9 Ohio St. 2d 80, 223 N.E.2d 606 (1967).

and to effectuate that intendment whenever it is lawful and within the competence of the Legislature. *Almac's, Inc.* v. *R. I. Grape Boycott Comm.*, 110 R. I. 36, 290 A.2d 52 (1972).

At the administrative hearing, Narragansett's president gave evidence of what has been common knowledge. When a Rhode Island track runs in competition with another New England track, the Rhode Island enterprise figuratively and literally runs out of the money. This official pointed out that during the interval the Rhode Island track is running unopposed much of the wagering is generated by the out-of-state bettor. However, at other times it is much more convenient for the Boston bettor, seeking to improve the breed, to take a short trip to Suffolk or a rapid dash to Rockingham. Where there's a choice, he related, the owner of the better horses takes his animals to the out-of-state track. This tendency reduces the number of horses who race in Rhode Island. This reduction in turn effects a lowering in the amount wagered on the races. The president explained that the scientific bettor is reluctant to invest two dollars on a horse who, if he placed third, would return a mere twenty cents on the two-dollar bet. According to Narragansett's chief executive, the more horses, the better the chance that the devotee of long-shots will part with some of his money.

It is obvious that ch. 222 is remedial legislation designed to give relief to stockholders who have invested in either one of Rhode Island's two pari-mutuel tracks. The 1971 legislation not only reduced the tax due when racing meets conflict but also provided that during such a time the track's share of the betting handle would be increased from eight per cent to eight and one-half per cent. In situations as the one presently before us reference is had to material such as Webster's Third New International Dictionary (1961). There we find some eleven definitions of the word

"period," encompassing a variety of matters ranging from the punctuation mark found at the end of a declarative sentence to a reference to the menstrual cycle. However, having in mind the purpose of ch. 222, we believe that the word "period" as applied to time conveys the thought of the separation of a designated interval of time from the flow of time in general. *Van Dresser* v. *Firlings*, 305 Mass. 51, 24 N.E.2d 969 (1940). The designated interval is that which is marked by the beginning and the completion of the out-of-state meet which is in competition with Rhode Island racing. The period contemplated by the General Assembly was a continuous period of time. If the Legislature had desired that the Administrator's tacking together of days of competition be the procedure to be followed, it could have easily used the word "days" instead of "periods."

In affirming the trial justice's decision, we would add a brief comment concerning the effect of a 1972 amendment[3] on the 1971 act. At its January 1972 session the General Assembly amended §41-4-3 so that during the period of New England competition a Rhode Island track pays a tax which is dependent upon the amount of the wagering. It ranges from a six per cent rate imposed on "daily" wagering up to $425,000, to a nine per cent rate when the handle exceeds $600,000. The Administrator argues that the addition of the word "daily" and the retention of the stipulation which reduces the rate "during such periods" when Rhode Island and New England tracks are operating "at the same time" shows that the Legislature adopted his view of the 1971 amendment.

Although subsequent legislation is not entitled to much weight in construing a statute, it is not always without significance. *Mattz* v. *Arnett*, 412 U. S. 481, 93 S.Ct. 2245,

---

[3]Public Laws 1972, ch. 49.

37 L.Ed.2d 92 (1973). Whether or not a later statute sheds light upon the meaning of a former statute depends upon a number of circumstances. 2A Sutherland, *Statutory Construction* §49.11 at 265 (4th ed. 1973). There must be, as in the case at bar, some rational basis for an inference that the Legislature adopted the Administrator's interpretation of §41-4-3, as amended by P. L. 1971, ch. 222. There is absolutely nothing in the record to show that in 1972 the Legislators were ever aware of the Administrator's view of "during such periods" and "at the same time."

To the contrary, the necessity for the addition of the word "daily" is obvious because of the Legislature's adoption of an adjustable tax rate which is based on the *day-to-day* amount of money that passes through the parimutuel windows.

The petition for certiorari is denied and dismissed.

Mr. Chief Justice Roberts did not participate.

*Stephen F. Achille,* for plaintiff-respondent.

*Richard J. Israel,* Attorney General, *W. Slater Allen, Jr.,* Asst. Attorney General, *Perry Shatkin,* Chief Legal Officer (Taxation), for defendant-petitioner.