390 A.2d 361.

Mary Roe *et al. v.* John J. Affleck *et al.*

AUGUST 16, 1978.

Present: Bevilacqua, C.J., Paolino, Joslin, Kelleher and Doris, JJ.

BEVILACQUA, C.J.   The United States District Court for the District of Rhode Island, acting pursuant to Sup. Ct. R.

6, has certified to this court two questions of law together with a statement of facts relevant to the controversy in which the question arose. The present action was initiated when the plaintiffs, Mary Roe and her son Richard, brought a civil action in the United States District Court for the District of Rhode Island seeking to enjoin the defendants, John J. Affleck, Dr. Joseph J. Bevilacqua, and Arthur F. Hanley of Blue Cross of Rhode Island from refusing to pay for Richard's necessary care and treatment at Bradley Hospital.

Mary Roe is employed full time, but because her expenses exceed her salary, she received a money supplement from the state under the Aid to Families with Dependant Children program. In addition, both she and Richard are covered by the State Medical Assistance program. Richard Roe is a 13-year-old boy who requires psychiatric hospitalization because he suffers from severe emotional and psychological illness as well as hyperactivity. As a result of his illness, on September 22, 1976, Richard was admitted to the Emma Pendleton Bradley Hospital (Bradley), an accredited hospital specializing in childhood and early adolescent psychiatric illnesses. At the present time, Richard remains at Bradly.

As Director of the Rhode Island Department of Social and Rehabilitative Services, defendant Affleck is responsible for administering the medical assistance program. This federal/state program furnishes funds for specified medical care and services to needy families with dependent children and to aged, blind, or disabled persons who may be either categorically or medically needy as defined by title XIX of the Social Security Act or Medicaid program. Congress authorized federal reimbursement under title XIX of the Social Security Act effective January 1, 1973, for inpatient psychiatric hospital services for persons under age 21; however, such services are optional. While medical care benefits are furnished to eligible beneficiaries pursuant to G.L. 1956 (1977 Reenactment) §40-8-4 through a state plan which includes inpatient hospital services, the state has opted not to provide inpatient psychiatric hospital services for individuals under age 21

under its medical assistance program. Consequently, defendant Affleck has refused to pay for the cost of inpatient psychiatric hospital care for persons under 21 years of age.

The defendant Bevilacqua, who is Director of the Rhode Island Department of Mental Health, Retardation and Hospitals (MHRH), is responsible for executing the provisions of the "Services for emotionally disturbed children" law. Sections 40.1-7-1 to 9. Those provisions establish a program for emotionally disturbed children including the placement of such children in pychiatric hospitals. Doctor Bevilacqua is currently providing care and treatment to approximately twenty children at Bradley. However, there are an additional thirty-six children who Bevilacqua had determined are eligible for program treatment and would benefit from psychiatric hospitalization, but whom he has not so placed because of insufficient funds. All these thirty-six emotionally disturbed children have been placed on a waiting list by defendant Bevilacqua.

Richard Roe, who has been found by Bevilacqua to be an emotionally disturbed child within the meaning of §§40.1-7-1 to 9 and therefore eligible for placement at Bradley, nevertheless was denied his request for placement at Bradley because Bevilacqua lacked the appropriate funds. Richard's name has been placed at the bottom of the waiting list until sufficient funds become available.

The first question cerified to this court reads as follows:

> "Do medical care benefits under the Rhode Island Medical Assistance Act, Title 40, Chapter 8 of the Rhode Island General Laws of 1956, as amended, include inpatient hospital services rendered in a psychiatric hospital to a child under age twenty-one (21) who is an eligible beneficiary under the Medical Assistance Act?"

The initial issue for our consideration is whether the cover-

age of inpatient hospital services under the State Medical Assistance program extends to and includes services rendered in a psychiatric hospital to eligible children under age 21.

During 1977 legislative session, the Rhode Island General Assembly partially answered the foregoing question by enacting chapters 61[1] and 269[2] of the 1977 Rhode Island Public Laws. These acts amended §§40-8-2(d) and 40-8-4 specifically to exclude from the term "inpatient hospital services" services performed in a "hospital, institution or facility for tuberculosis or mental diseases." Therefore, it is axiomatic that as of the effective dates of the enactments, May 5 and 13, medical care benefits under the Medical Assistance Act, as amended, do not include inpatient hospital services rendered in a psychiatric hospital to an eligible child under age 21.

What remains to be determined, however, is whether the phrase "inpatient hospital services" encompassed services furnished in a psychiatric hospital to children under 21 prior to the effective dates of the previously mentioned amendments. Before the passage of those acts §40-8-4 read as follows:

> "the department [of Social and Rehabilitative Services] shall furnish medical care benefits to eligible beneficiaries through a direct vendor payment plan. The plan shall include, but need not be limited to, any or all of the following benefits, which benefits shall be contracted for by the director:
>
> a. inpatient hospital service;
> b. nursing services for such periods of time as the director shall authorize;

---

[1]P.L. 1977, ch. 61, which was entitled "An Act Relating to Medical Assistance," was approved on May 5, 1977.

[2]P.L. 1977, ch. 269, which was also entitled "An Act Relating to Medical Assistance," became effective on May 13, 1977.

  c. visiting nurse service;

  d. drugs for consumption either by inpatients or by
  other persons form whom they are prescribed by a
  licensed physician;

  e. dental service."

Section 40-8-2(d) provided that the term "inpatient hospital services" included the following items and services furnished to an inpatient in a hospital:

  "(1) bed and board;

  "(2) such nursing services and other related services, as
  are customarily furnished by the hospital for the
  care and treatment of inpatients and such drugs,
  biologicals, supplies, appliances and equipment for
  use in the hospital, as are customarily furnished by
  such hospital for the care and treatment of
  patients;

  "(3) such other diagnostic or therapeutic items or ser-
  vices, including but not limited to pathology,
  radiology and anesthesiology furnished by the hos-
  pital or by others under arrangements made by the
  hospital, as are customarily furnished to inpatients
  either by such hospital or by others under such
  arrangements, and services as are customarily
  provided to inpatients in the hospital by an intern
  or resident-in-training under a teaching program
  having the approval of the council on medical edu-
  cation and hospitals of the American Medical
  Association or of any other recognized medical
  society approved by the director.

  "The term 'inpatient hospital services' shall be taken
  to include medical and surgical services provided by the
  inpatient's physician, but shall not include the services
  of a private duty nurse."

  Although subsequent legislation is not entitled to much weight in construing a statute, it is not always without

significance. *Mattz* v. Arnett, 412 U.S. 481, 93 S. Ct. 2245, 37 L. Ed. 2d 92 (1973). Whether or not a later statute sheds light upon the meaning of a former statute depends upon a number of circumstances. *Narragansett Racing Association, Inc.* v. *Norberg*, 112 R.I. 791, 316 A.2d 334 (1974). In this case the definition of the term "inpatient hospital services" must be examined in order to ascertain whether such services included inpatient psychiatric treatment prior to the 1977 amendment of §40-8-2(d).

According to §40-8-2(d), inpatient hospital services included services customarily furnished by a hospital including *but not limited to* pathology, radiology, and anesthesiology. Additionally, the provision spoke in terms of "drugs, biologicals, supplies, appliances, and equipment for use in the hospital." Clearly, the Legislature is in the best position to ascertain the most desirable construction of a statute. We believe that when the Legislature amended §40-8-2(d) to resolve the doubtful meaning of the provision, such action constituted evidence that the previous statute meant the exact contrary. 2A Sands, *Statutes and Statutory Construction* §49.11 at 265 (4th ed. 1973). This conclusion is bolstered by the commonly accepted knowledge that some of the services described as "inpatient hospital" in the unamended statute are customarily performed at psychiatric hospitals. As a factual matter, psychiatric hospitals ordinarily supply hospital services such as pathology and anesthesiology. Thus, we believe that psychiatric hospital services were included within the ambit of the Medical Assistance Act.

Applying the foregoing discussion to the terms of the first certified question, we hold that prior to the effective dates of the amendments of §§40-8-2(d) and 40-8-4 medical care benefits under the Rhode Island Medical Assistance Act, G.L. 1956 (1977 Reenactment) chapter 8 of title 40, included inpatient hospital services rendered in a psychiatric hospital to a child under age 21 who is an eligible beneficiary under said Act.

The second certified question to this court reads as follows:

"Does the Services for emotionally disturbed Children law contained in Title 40.1, Chapter 7, of the Rhode Island General Laws of 1956, as amended, require the Rhode Island Department of mental Health, Retardation, and Hospitals either to provide reasonable care and treatment or to provide funds for the reasonable care and treatment of an emotionally disturbed child once the Department has made a determination the child is emotionally disturbed within the meaning of the Services for emotionally disturbed Children law, and where adequate legal provision therefor has not already been made?"

Under §40.1-7-2 a state program was established within MHRH known as "Services for emotionally disturbed children." Doctor Bevilacqua, as director of MHRH, is responsible for developing public policy and programs related to the needs of emotionally disturbed children and is responsible for executing the provisions of the "Services for emotionally disturbed children" program. Section 40.1-7-5.[3] It is uncontroverted that Richard Roe is an "emotionally disturbed child"

---

[3]General Laws 1956 (1977 Reenactment) §40.1-7-5 reads as follows:

"Under the direction of the state director of mental health, retardation and hospitals the department shall have the responsibility for developing the public policy and programs related to the needs of emotionally disturbed children and shall be charged with the responsibility of executing the provisions of this chapter. In fulfilling it responsibilities the department, among other things, shall:

"a. Plan a diversified and comprehensive network of programs and services to meet the needs of emotionally disturbed children including, but not limited to preventive, casefinding, diagnostic, treatment, rehabilitative or aftercare services;

"b. Provide the overall management and supervision of the state program for emotionally disturbed children;

"c. Promote the development of programs for preventing and controlling emotional or behavioral disorders in children;

"d. Coordinate the efforts of the several state departments and agencies for

as that term is defined in §40.1-7-4(5).[4] Additionally, the parties agree that he requires care and treatment at Bradley within the meaning of §40.1-7-4(1).[5] Despite the foregoing concessions relevant to Richard's eligibility, Dr. Bevilacqua has refused to pay for his care and treatment because of budgetary considerations. Accordingly, Richard's name has been placed on a waiting list.

Before we consider the obligation of Dr. Bevilacqua, we must ascertain the scope of the financial responsibility charged to the parents of each eligible child. Section 40.1-7-8 reads as follows:

> "The parents of children in the program, depending upon their *resources*, shall be obligated to participate in the costs of the care and treatment of their children in accordance with regulations to be promulgated by the director." (Emphasis added.)

---

the care and treatment of emotionally disturbed children and to cooperate with private agencies serving said children;

"e. Promote the development of new resources for program implementation in the treatment of emotionally disturbed children;

"f. Provide research and analysis for evaluation of services;

"The director may adopt such rules and regulations relative to the implementation and administration of the general duties and powers of the department as he may deem necessary to carry out the provisions of this chapter.

[4]General Laws 1956 (1977 Reenactment) §40.1-7-4(5) reads as follows:

" 'Emotionally disturbed child' means any person under the age of twenty-one (21) years, and who has been diagnosed and judged by the examining physician to be in need of psychiatric care and treatment."

[5]General Laws 1956 (1977 Reenactment) §40.1-7-4(1) reads as follows:

" 'Care and treatment' means medical and psychiatric care, medical attention, nursing and medications as well as food, clothing and maintenance, psychological, social work and recreational services and those educational services furnished to a child other than those regular or special education programs under the jurisdiction of the board of regents for education."

The term "resources" must be defined in order to determine the extent of the financial obligation imposed upon the parents of emotionally disturbed children under this statute.

In construing the language of a statute, we must accord words used therein their ordinary and customary meaning unless a contrary intention clearly appears on the face of the statute. *Bristol County Water Co.* v. *Public Utilities Commission,* 117 R.I. 89, 363 A.2d 444 (1976); *Andreozzi* v. *D'Antuono,* 113 R.I. 155, 319 A.2d 16 (1974). The term "resources" is defined in Webster's Third New International Dictionary at 1934 (1968) as:

> "available means * * * computable wealth * * * immediate and possible sources of revenue * * *."

Additionally, the word is defined in 77 C.J.S. *Resources* at 316 (1952) as:

> "Money or any property which can be converted into supplies; available means or capability of any kind * * * pecuniary means; funds."

Other jurisdictions have held that the term "resources" implies the present cash value of property to the owner. *Begay* v. *Graham,* 18 Ariz. App. 336, 501 P.2d 964 (1972); *Cerenzia* v. *Department of Social Security,* 18 Wash. 2d 230, 138 P.2d 868 (1943). Basing our opinion upon the foregoing definitions, we believe that the term "resources" as used in §40.1-7-8 includes, *inter alia,* the income and wealth of parents of children in the program, as well as insurance policies and Blue Cross policies. Consequently, these ancillary sources should be utilized prior to requiring Dr. Bevilacqua to provide monetary assistance.

The plaintiffs and defendant Blue Cross contend that the "Services for emotionally disturbed children" law creates a statutory duty and responsibility upon Dr. Bevilacqua and MHRH to provide "care and treatment" to children certified as "emotionally disturbed" notwithstanding defendant Bevilacqua's argument concerning the lack of operating

funds. Furthermore, they allege that the mere failure by Legislature to appropriate sufficient funds without words modifying or repealing the statutory obligation does not alone delimit or repudiate Dr. Bevilacqua's duty as outlined in §§40.1-7-1 to 9. Bevilacqua responds, in essence, that he has no further responsibility other than to expend the appropriated funds. Although he has raised lack of funds as a defense in other actions, *Giacomini* v. *Bevilacqua,* 118 R.I. 63, 372 A.2d 66 (1977) and *Richardson* v. *Bevilacqua,* 115 R.I. 49, 340 A.2d 188 (1975), this court has never addressed this issue.

The responsibility of MHRH is outlined in §40.1-7-3 as follows:

> "The department is charged with the responsibility to promote the development of specialized services for the care and treatment of emotionally disturbed children and to cooperate to this end with all reputable agencies of a public or private character serving such children and to take the initiative in all matters involving the interest of such children where adequate legal provision therefor has not already been made."

The above provision coupled with previously noted §40.1-7-5 direct MHRH to develop public programs related to the needs of emotionally disturbed children and to take the initiative in all matters involving the interest of such children where adequate legal provision has not already been made. It seems clear that according to the "Services for emotionally disturbed children" law, Dr. Bevilacqua, as director of MHRH, is responsible for the care and treatment of eligible emotionally disturbed children. In fact, he agrees with plaintiffs' construction of those provisions but alleges that his authority to act on behalf of eligible children is limited by his budgetary allowances.

We now examine the latter part of §40.1-7-3 to ascertain the scope of Dr. Bevilacqua's financial obligation. It orders MHRH and its director to take the initiative in all matters

concerning the interests of eligible emotionally disturbed children "where adequate legal provision thereof has not already been made." In our opinion this latter phrase relieves Dr. Bevilacqua of any primary financial responsibility where other resources are available. Only after reasonable attempts are made to seek other available sources of support should he be obligated to expend legislative appropriations for the curative treatment of eligible children.

The plaintiffs contend that a dollar limitation in an appropriation statute does not repeal or delimit a statutory obligation even where the discharge of that obligation will result in expenses that exceed the appropriation. In support of this argument they cite *In re State House Construction Loan*, 20 R.I. 704, 38 A. 927 (1897), a case which concerns a bond and not a statutory appropriation. In that case, the court ruled that a bond, which earmarked $1,500,000 for the acquisition of a site for and the construction of a state house, did not prohibit state officials from incurring liability for the project beyond the amount appropriated, where the bond allocated a fixed sum for the fund but did not expressly limit the expenditure. However, *In re State House* does not stand for the proposition that an official has a duty to exceed the dollar limitation even where he has not yet assumed a binding obligation.

In the instant case, such a binding obligation has not yet been incurred by Dr. Bevilacqua, because the mere act of certification does not charge the state with any contractual liability for treatment, nor is ther any contractual obligation to provide such treatment. Additionally, Bevilacqua, as director of MHRH is not authorized to incur any debt which would bind the state except insofar as his action creating such a debt is authorized by law. *Ct. In re The Incurring of State Debts*, 19 R.I. 610 37 A. 14 (1896). We conclude that there is

---

[6]Section 40.1-7-9 reads in pertinent part as follows:

"There is appropriated to the department of mental health, retardation, and hospitals out of any money in the treasury not otherwise appropriated for the fiscal year 1976-1977 the sum of four million dollars ($4,000,000), for

no duty inherent in the appropriate statute, §40.1-7-9,[6] or imposed by the holding in *In re State House,* to contract for the care of eligible emotionally disturbed children in an amount that exceeds statutory appropriations.

The defendant Bevilacqua is presently paying for treatment of approximately twenty children in the residential program at Bradley. There are an additional thirty-six children whom he has determined to be eligible for program benefits, but whom he has not placed at Bradley due to lack of funds. Children who have been determined eligible for placement at Bradley have been placed and treated on a "first come, first served" basis. We recognize that the appropriated funds are finite and that the funds expended for the care of one child are unavailable to others. Likewise, there is no question that curative treatment for an emotionally disturbed child is a worthy goal. However, we believe that Dr. Bevilacqua must accommodate budgetary realities. Although, ideally speaking, mere money should not be a consideration relevant to the treatment of an eligible child, the inescapable fact remains that it is. *State of New Jersey,* 145 N.J. Super. 381, 367 A.2d 1198 (1976), *cert. denied,* 74 N.J. 260, 377 A.2d 665 (1977).

It is our opinion that eligibility alone is not an adequate basis upon which to hold that Richard Roe is entitled to treatment. Notwithstanding the scope of defendant Bevilacqua's responsibility, his authority to act on behalf of eligible children is limited by his appropriated financial resourses. Therefore, we conclude that the "Services for emotionally disturbed children" law contained in G.L. 1956 (1977 Reenactment) chapter 7 of title 40.1 does not require MHRH either to provide reasonable care and treatment or to provide funds for such care of an emotionally disturbed child once the department has found that the child is emotionally disturbed

---

the fiscal year 1977-1978 the sum of four million dollars ($4,000,000), and for the fiscal year 1978-1979 the sum of four million dollars ($4,000,000), to carry out the purposes of chapter 40.1-7 entitled 'Services for emotionally disturbed children.' "

within the meaning of said law, and where adequate legal provision has not already been made when appropriated funds are not available.

Mr. Justice Paolino participated in the decision but retired prior to its announcement.

*William Rutzick, John M. Mola, Alden C. Harrington,* Rhode Island Legal Services, Inc., for plaintiffs.

*Julius C. Michaelson,* Attorney General, *Harold E. Krause, Jr.,* Special Assistant Attorney General, for defendants.